WELCH, J.
Lin this action for damages, the defendants, Katherine Skinner and her liability insurer, USAA Casualty Insurance Company[1] (“USAA”) appeal a judgment rendered pursuant to a jury verdict in favor of the plaintiff, Timothy E. Kelley, and against Skinner and USAA, in solido, in the amount of $422,500.00, plus judicial interest and costs. Kelley has separately appealed challenging the quantum of damages awarded by the jury for his personal injuries. For reasons that follow, we affirm the judgment of the trial court.
FACTUAL AND PROCEDURAL HISTORY
On March 16, 2008, Kelley was a patron of the “Exxon on the Run” located on Perkins Road in Baton Rouge, Louisiana, and was pumping gas into his vehicle at one of the gas pumps. At the same time, an unidentified patron, who had finished pumping gas at the pump opposite Kelley, drove off with the gas pump hose and nozzle still attached to the patron’s vehicle. The hose stretched and ultimately snapped back, violently striking and injuring Kelley. Kelley sustained injuries from this incident, including back and neck injuries, which aggravated his pre-existing back and neck injuries that had previously required surgery.
On March 12, 2009, Kelley timely filed a petition for damages against his uninsured/underinsured motorist (“UM”) carrier, General Insurance Company of America, on the basis that the unidentified patron, who drove away with the gas pump hose still attached to the vehicle, was “uninsured” under the applicable law and pursuant to his contract of insurance. In addition, Kelley sued alleged tortfea-sors, Gilbarco, Inc. (“Gilbarco”), Catlow, Inc. (“Catlow”), Exxon Mobil ^Corporation (“Exxon”), and R.L. Hall and Associates (“Hall”).[2] In a supplemental and amending petition filed on March 2, 2011, Kelley added as defendants Skinner, the previously unidentified patron who drove away with the gas pump attached to her vehicle, and her liability insurer, USAA[3] According to Kelley, he *532 added Ms. Skinner to the lawsuit as soon as he was able to identify and locate her.[4]
Skinner and USAA filed a peremptory-exception raising the objection of prescription, urging that Kelley’s claims had prescribed because they were filed more than one year after the date of the accident. Arguing that the exception should be referred to the trial on the merits because the basis for the exception was dependant upon the jury’s findings, Skinner and USAA asserted that “unless the jury finds that [they] are joint tortfeasors with a timely named and served defendant ... or are liable in solido with a timely named and served defendant ..., the petition ... is barred by the one year prescriptive period provided under La. [Civil Code art.] 3492.” At a hearing on July 25, 2012, the issue of prescription was argued and submitted, and the trial court overruled the exception in a judgment signed on July 27,2012.[5]
|4The matter then proceeded to a jury trial from July 15, 2013, until July 17, 2013. At the conclusion of the trial, the jury awarded Kelley damages as follows:
Past medical expenses $130,500.00
Future medical expenses $12,000.00
Past physical pain and suffering $150,000.00
Future physical pain and suffering $55,000.00
Past mental anguish ■ $75,000.00
Future mental anguish $0.00
Loss of enjoyment of life $0.00
TOTAL $422,500.00
Following the jury’s verdict, Skinner and USAA re-urged the peremptory exception raising the objection of prescription, and the trial court overruled the objection. Thereafter, the trial court signed a written judgment on September 4, 2108, in accordance with the jury’s verdict as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of the plaintiff, Timothy E. Kelley, and against defendants, Katherine Skinner and USAA Casualty Insurance Co., in solido, in the sum of Four Hundred Twenty-Two Thousand Five Hundred ($422,500.) Dollars, together with judicial interest thereon and for costs.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of the defendant, General Insurance Company of America, *533 and against the plaintiff, Timothy E. Kelley, dismissing the plaintiff’s lawsuit against General Insurance Company of [America], with prejudice and at the plaintiffs costs.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that (1) the cross-claim of General Insurance Company of America against defendants, Katherine Skinner and USAA Casualty Insurance Co. is dismissed as moot; and (2) the exception of prescription of Katherine Skinner and USAA Casualty Insurance Co. directed to the plaintiffs cause of action is [overruled].
IsKelley filed a motion for judgment notwithstanding the verdict (JNOV), which was denied by the trial court in a judgment signed on November 8, 2013.
Skinner and USAA have appealed the trial court’s September 4, 2013 judgment challenging the trial court’s ruling on the objection of prescription. Kelley filed a separate appeal, challenging both the trial court’s final judgment of September 4, 2013, and the trial court’s November 8, 2013 judgment denying his JNOV. In his appeal, Kelley contends that the jury abused its discretion and was manifestly erroneous in: failing to award him damages for loss of enjoyment of life and future mental anguish when such damages .were sufficiently proven and awarding damages that were excessively low. Further, Kelley answered Skinner and USAA’s appeal, arguing that should this court decide that Skinner and USAA are not liable for his damages, then his UM insurer, General, should be cast with the full amount of the judgment (amended pursuant to the arguments set forth in his appeal), as General was timely sued within the prescriptive period from the date of the accident.
LAW AND DISCUSSION

Prescription

Louisiana Civil Code Article 3492 provides that delictual actions are subject to a liberative prescription of one year, which commences to run from the day injury or damage is sustained. See also Rabom v. Albea, 2013-0633 (La.App. 1st Cir.4/16/14), 144 So.3d 1066, 1070-1071, writ denied, 2014-1239 (La.9/26/14), 149 So.3d 264. The objection of prescription may be raised by a peremptory exception. La. Code Civ. P. art. 927(A)(1). At the trial of a peremptory exception, evidence may be introduced to support or controvert any of the objections pleaded, when the grounds thereof do not appear from the petition. La. Code Civ. P. art. |fi931. When prescription is raised by peremptory exception, with evidence being introduced at the hearing on the exception, the trial court’s findings of fact on the issue of prescription are subject to the manifest error-clearly wrong standard of review. London Towne Condominium Homeowner’s Ass’n v. London Towne Co., 2006-401 (La.10/17/06), 939 So.2d 1227, 1231. Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993). But, in a case involving no dispute regarding material facts — only the determination of a legal issue — a reviewing court must review the issue de novo, according the trial court’s legal conclusions no deference. Cawley v. National Fire & Marine Ins. Co., 2010-2095 (La.App. 1st Cir.5/6/11) 65 So.3d 235, 237.
Prescription is interrupted by the filing of suit in a court of competent jurisdiction. La. C.C. art. 3462. The interruption of prescription against one soli-dary obligor is effective against all solidary *534 obligors. La. C.C. arts. 1799 and 3503. Generally, the burden of proving an action is prescribed lies with the party pleading prescription. Hogg v. Chevron USA, Inc., 2009-2632 (La.7/6/10), 45 So.3d 991, 998. An exception to this general rule exists when the face of the petition shows that the cause of action is prescribed, in which case the burden shifts to the plaintiff to prove that prescription was interrupted or suspended. Bailey v. Khoury, 2004-0620 (La.1/20/05), 891 So.2d 1268, 1275. Additionally, if the plaintiffs basis for claiming interruption of prescription is solidary liability between two or more parties, then the plaintiff bears the burden of proving that solidarity exists. Younger v. Marshall Industries, Inc., 618 So.2d 866, 869 (La.1993).
[7In this case, Kelley’s supplemental and amended petition was filed more than one year after the accident. Thus, Kelley bore the burden of proving that prescription against Skinner and USAA was either interrupted or suspended. As to this issue, Kelley argues that a solidary relationship existed between Skinner and USAA such that the timely filed action against his UM carrier, General, interrupted prescription against all solidary obligors and/or joint tortfeasors.[6] In other words, Kelley claims that his timely filed suit against one debtor, in solido, General, interrupted prescription against all solidary obligors, i.e., Ms. Skinner, and thus, her liability insurer, USAA (with whom she was solidarity liable).[7] In support of his contention, Kelley relies on Hoefly v. Government Employees Ins. Co., 418 So.2d 575, 579 (La.1982), wherein the Louisiana Supreme Court held that a timely filed lawsuit by an injured Victim and her husband against the tortfeasors interrupted prescription against the plaintiffs’ UM carrier because the tortfeasors and the plaintiffs’ UM carrier were solidarity liable pursuant to Louisiana Civil Code definition of solidary obligations for obligors. The current definition of solidary obligations for obligors is set forth in La. C.C. art. 1794 and | ^provides that “[a]n obligation is soli-dary for the obligors when each obligor is liable for the whole performance” and when “[a] performance rendered by one of the solidary obligors relieves the others of liability toward the obligee.”[8]
*535 On the other hand, Skinner and USAA contend, by relying on Fertitta v. Allstate Ins. Co., 462 So.2d 159 (La.1985) and Rizer v. American Sur. and Fidelity Ins. Co., 95-1200 (La.3/8/96), 669 So.2d 387, that there was no solidary liability between Skinner and General because a solidary obligation between General and Skinner would have arisen only if Kelley’s damages exceeded the amount of Skinner’s liability coverage under the USAA policy, and since Kelley’s damages did not exceed the amount of liability coverage, the suit against Kelley’s UM carrier, General, did not interrupt prescription as to Skinner and USAA.[9] We find no merit to this argument.
In Hoefly, Mrs. Hoefly was struck and injured by a car driven by Kim Lewiston, a minor. Approximately eleven months later, Mrs. Hoefly and her husband filed suit against the owner of the car (Neftalí Rodriquez), Mrs. Margaret C. Lewiston (Kim Lewiston’s mother), and Mrs. Lewiston’s liability insurer, claiming that Mrs. Lewi-ston was negligent in allowing an unlicensed minor to drive. Hoefly, 418 So.2d at 576-577. Approximately three years later, the Hoeflys filed an amended and supplemental petition naming their UM carrier as defendant alleging that Ms. Rodriquez was uninsured and that Mrs. Lewiston was |3underinsured. The UM carrier filed a peremptory exception raising the objection of prescription, claiming that the filing of suit against the tortfeasor and his liability insurer did not interrupt prescription against the UM carrier of the injured party. The trial court sustained the objection and the court of appeal affirmed. Hoefly, 418 So.2d at 577. However, the Louisiana Supreme Court disagreed and reversed. Hoefly, 418 So.2d at 577 and 580. In doing so, the court noted the definition of a solidary obligation for obligors and then analyzed the obligation presented and concluded that it satisfied the prerequisites for a solidary obligation. Hoefly, 418 So.2d at 578; In reaching this determination, the court reasoned that:
The tortfeasor and the [UM] carrier are obliged to the same thing. A tort-feasor is obliged to repair the damage that he has wrongfully caused to the innocent automobile accident victim. La.C.C. art. 2315. Subject to conditions not granted the tortfeasor, the uninsured motorist carrier is independently obliged to repair the same damage. By effect of the [UM] statute, La. R.S. 22:1406(D)(l)(a)[10], and its insuring agreement, the plaintiffs’ uninsured motorist carrier is required to pay, subject to statutory and policy conditions, amounts which they are entitled under other provisions of law to recover as damages from owners or operators of uninsured or underinsured motor vehicles. By effect of law and the terms of the insuring agreement, therefore, both the uninsured motorist carrier and the tortfeasor are obliged to the same thing....
The tortfeasor and the uninsured motorist carrier each may be compelled for the whole. The principal result of solidarity is to prevent the division of the *536 debt and to obligate each debtor for the whole, as if he were alone.... This essential element of solidarity, that each debtor may be compelled for the whole, means simply that the debtor who has been sued cannot plead the benefit of division, which was invented for the benefit of sureties whereby the creditor is required to divide his action between them. That each debtor is held for the whole, [ie.], unable to plead the benefit of division, is solidarity’s most direct consequence....
This requisite of solidarity is satisfied in the case of the uninsured motorist and the tortfeasor because neither may plead the benefit of | indivision, as if each were alone. To permit the tortfeasor or uninsured motorist carrier to plead the benefit of division would be inimical to the legislative aim of the uninsured motorist statute. The object of that legislation is to promote full recovery for damages by innocent automobile accident victims by making uninsured motorist coverage available for their benefit as primary protection when the tortfea-sor is without insurance and as additional or excess coverage when he is inadequately insured.... The statute is 10 be liberally construed to carry out this objective of providing reparation for those injured through no fault of their own.... The legislation cannot be construed, therefore, to benefit the insurer and the tortfeasor by requiring the accident victim to divide his action between them.
The uninsured motorist carrier is obliged differently from the tortfeasor because its liability is conditioned by the tortfeasor’s total or partial lack of liability insurance, the type of damage he has caused and any limits in the insurer’s policy that are permitted by law. Contrary to [the UM carrier’s] arguments, however, the terms and conditions which have been allowed the uninsured motorist carrier by law and by contract, while the tortfeasor is bound pure and simple, do not prevent the uninsured motorist carrier and the tortfeasor from being obliged to the same thing or being unable to plead the benefit of division. “The obligations may be in solido, although one of the debtors be obliged differently from the other to the payment of one and the same thing; for instance, if the one be but conditionally bound, whilst the engagement of the other is pure and simple, or if the one is allowed a term which is not granted to the other.” La. C.C. art. 2092....
For similar reasons, the fact that the uninsured motorist carrier is bound by the combined effect of the tortfeasor’s wrongful act, the uninsured motorist statute, and the carrier’s delivery or issuance for delivery of automobile liability insurance, while the tortfeasor is obliged merely because of his delict, does not prevent there being an obligation in solido on the part of the debtors. The obligation may be in solido even though the obligations of the obli-gors arise from separate acts or by different reasons. La.C.C. arts. 2091, 2092, ...
When payment is made by either the tortfeasor or the uninsured motorist carrier the other is exonerated toward the creditor as to the solidary obligation. This is a direct consequence of each debtor being obliged to the same thing so that each may be compelled for the whole, as if he were the sole debtor.... Moreover, the underlying purpose of both delictual responsibility and uninsured motorist coverage is to promote and effectuate complete reparation, no more or no less. Accordingly, as to the debt to which the tortfeasor and uninsured motorist carrier are solidarity *537 obliged, payment of it by one exonerates the other toward the creditor.
[[Image here]]
InThe solidary obligation in the present case results primarily from provisions of law, viz., the general rules of delictual responsibility, La. C.C. arts. 2315 et seq., and the uninsured motorist statute, La. R.S. 22:1406(D)[11], Although an insurer must deliver or issue for delivery automobile liability insurance in order to be bound, the basic ingredients of the obligation are provided and required by law. Under these circumstances, the obligation is solidary by operation of law, without requiring an express declaration.
Hoefly, 418 So.2d at 578-580.
A few years later, in Rizer, the Louisiana Supreme Court held that a timely filed action against a tortfeasor’s liability insurer did not interrupt prescription as to the plaintiffs UM carrier. In Rizer, the plaintiff was driving a vehicle owned by Gregory Baldwin when the plaintiff was struck from behind by a vehicle driven by Jerry W. Boudinot, Jr. Approximately four months later, the plaintiff filed suit against the liability insurer of Mr. Boudinot (the tortfeasor). Approximately two years after suit was filed, the plaintiff amended his suit to add Mr. Baldwin’s liability and UM insurer as defendant, and three months thereafter, the plaintiff added Mr. Boudi-not as a defendant. Later, almost three years after the accident, plaintiff amended the suit to include his own UM carrier as a defendant. Rizer, 669 So.2d at 388. The plaintiffs UM carrier filed a peremptory exception raising the objection of prescription contending that it was not timely sued within the two-year prescriptive period set forth in La. R.S. 9:5629[12] and that prescription was not interrupted because the UM carrier was not solidarity liable with any of the parties sued within the prescription period. Id.
|12The Rizer court then discussed Hoefly and noted that the sources of the obligor’s debts are irrelevant so long as the obligors are obligated to repair the same damages. Rizer, 669 So.2d at 389. Consequently, the different sources of liability would not preclude an in solido obligation to the extent that each is liable for certain damages sustained by the plaintiff. Id. However, the court then found that under the UM statute, the “obligation of the [UM] carrier does not begin until the obligation under the tortfeasor’s motor vehicle liability policy ends” and that there was “no overlap.” Rizer, 669 So.2d at 390. “Since an uninsured motorist carrier and a tort-feasor’s motor vehicle liability insurer each has a separate obligation which is not coextensive, they are not liable for the same thing.” Id. Thus, the court then held that the victim’s UM carrier and the tort-feasor’s liability insurer were not solidary obligors. Id.[13]
*538 Based on Rizer, USAA and Skinner argue that Kelley’s claims against them are prescribed. However, we find that Rizer is factually and legally distinguishable from the present case and thus, not applicable. In Rizer, the court’s holding was limited to the determination that a timely filed suit against the tortfeasor’s liability insurer did not interrupt prescriptions as to the later added UM carrier of the plaintiff because the two insurers were not solidarily bound, since the liability of one only came into play after the liability of the other was exhausted. Herein, while USAA and General may not be solidary obligors under Rizer, General and Skinner, |13the tortfeasor, are bound to the plaintiff for the same debt and pursuant to Hoefly, they are solidary obligors. Consequently, Kelley’s timely filed suit against General interrupted prescription as to Skinner, and thus her liability insurer, USAA, with whom Skinner is solidarity liable. See Pearson v. Hartford Accident and Indemnity Company, 281 So.2d 724, 725 (La.1973) (an insured and his liability insurer are solidary obligors, even though the obligations of the obligors arise from separate acts or by different reasons of law).
Although Skinner and USAA acknowledge that Skinner is a solidary obligor with General, they further claim that the solidary liability is limited to the extent that Skinner is underinsured for Kelley’s damages. They claim that since Kelley’s damages did not exceed Skinner’s policy limits with USAA, there was no liability on the part of Kelley’s UM carrier (General), and therefore, in retrospect, Skinner and General were never liable in solido and Kelley’s timely filed suit against General never interrupted prescription against Skinner. In furtherance of this argument, USAA and Skinner rely on Fertitta. However, we find Fertitta has limited application to the case before us.
In Fertitta, while the status of a tortfea-sor and the plaintiffs UM carrier as soli-dary obligors was discussed, it was not for purposes of prescription, but rather in the context of determining the amount owed to the plaintiff by each defendant and whether a payment by one obligor reduced the obligation for the other. The court noted that the underinsured tortfeasor and the plaintiffs UM carrier were solidary obli-gors because they were both legally bound to repair the plaintiffs damages in the amount that the damages exceed the $10,000 limits of the tortfeasor’s liability policy. Fertitta, 462 So.2d at 162. However, the tortfeasor’s liability insurer had been cast in judgment for the full amount of the judgment against the tortfeasor | Ubecause of the liability insurer’s bad faith in refusing to settle the claim. The supreme court noted that the liability insurer’s bad faith in the improper handling of the claim, which extended its liability beyond its policy limits, did not destroy solidarity between the tortfeasor and the plaintiffs UM carrier since the liability insurer was still liable to the plaintiff by virtue of the policy only for the $10,000 policy limits and the rest of its liability was to the insured tortfeasor for the bad faith handling of the claim. Fertitta, 462 So.2d at 162-163. The plaintiffs UM carrier had previously settled with the plaintiff and had waived any right to subrogation or other reimbursement in the event the plaintiff recovered by judgment or settlement against other parties liable for her damages. Hence, in Fertitta the issue to be determined was which party should benefit from the UM carrier’s payment to the plaintiff (which turned out to be an overpayment) in light of the full payment of the entire damages awarded by the *539 tortfeasor’s liability insurer. The court concluded that the UM carrier’s overpayment was imputed to the tortfeasor’s debt to the plaintiff because the tortfeasor and the UM carrier were solidary obligors.[14] Fertitta, 462 So.2d at 163-165.
Thus, Fertitta simply does not support Skinner and USAA’s contention that Skinner’s solidary liability with Kelley’s UM carrier (General) hinges on whether the amount of damages awarded exceeds the liability policy. Furthermore, Skinner and USAA’s argument in this regard has been expressly rejected by Louisiana courts.
11sIn Hayden v. Gittens, 97-0726 (La. App. 4th Cir.12/10/97), 704 So.2d 927, 929, the issue before the court was whether the parties were solidary obligors for purposes of determining venue. Therein, the plaintiffs UM carrier was timely sued and served, but the insured tortfeasor and his employer were not served until several years after the accident. The court ultimately determined that the plaintiffs UM carrier, the tortfeasor, and the tortfeasor’s employer were solidary obligors under Hoefly. Id. The tortfeasor and his employer had attempted to distinguish Hoefly on the basis that in Hayden, the UM carrier would likely not be held responsible for any amount of damages because the limits of the liability insurance policy could not be exhausted, whereas in Hoefly the tortfeasors were uninsured and under-insured. Hayden, 704 So.2d at 930. The court found that the distinction was “without merit because the basis for solidarity is determined as of the time suit is filed, and solidarity, once determined, is not negated by a later determination of policy limits, settlement offers or agreements, or the ultimate insolvency of a particular insurer.” Id. (Emphasis added). Under this reasoning, we find Skinner and USAA’s argument that, in retrospect. Skinner and General were never liable in solido because Kelley’s damages did not exceed Skinner’s policy limits with USAA, lacks merits.
Additionally, in Aguilar v. Transit Management of Southeast Louisiana, Inc., 2004-1027 (La.App. 5th Cir.3/1/05), 900 So.2d 65, 68-69, the court held that the insured tortfeasor, whose identity was discovered and who was sued approximately a year and a half after the accident, and his liability insurer were solidarity liable with the injured plaintiffs UM carrier, and thus, prescription was interrupted by the plaintiffs timely suit against his UM carrier. In making this determination, the court specifically rejected the argument of the tortfeasor and his | pliability insurer that they “were only solidarity liable for the excess portion of the judgment.” Aguilar, 900 So.2d at 69.
Therefore, after considering the record and the applicable jurisprudence, we find that Kelley established that Skinner and General, his UM carrier, were solidarity hable for Kelley’s damages, and thus Kelley’s timely suit against General interrupted prescription against all solidary obli-gors, including Skinner and her liability insurer, USAA, with whom she was solidarity liable. Accordingly, the trial court properly overruled Skinner and USAA’s peremptory exception raising the objection of prescription.

Quantum

On appeal, Kelley contends that the jury abused its discretion and committed mani *540 fest error in awarding no damages for loss of enjoyment of life or future mental anguish, after such damages were sufficiently proven. Kelley maintains that the jury’s award of damages was not supported by the record and that the evidence was so strongly in his favor that reasonable persons could not reach different conclusions. Kelley further asserts that the jury’s award of damages was excessively low, attacking both general and special damages. For the reasons set forth more fully below, we find no manifest error or abuse of discretion in the damages awarded by the jury.

A. Standard of Review

It is well settled that a judge or jury is given great discretion in its assessment of quantum, of both general and special damages. La. C.C. art. 2324.1; Guillory v. Lee, 2009-0075 (La.6/26/09), 16 So.3d 1104, 1116. Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact that is entitled to great deference on review. Wainwright v. Fontenot, 2000-0492 (La.10/17/00), 774 So.2d 70, 74. The standard for appellate review of general damages is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), wherein the Louisiana Supreme Court stated that “the discretion vested in the trier of fact is ‘great,’ and even vast, so that an appellate court should rarely disturb an award of general damages.” The appellate court’s first inquiry should be “whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the ‘much discretion’ of the trier of fact.” Youn, 623 So.2d at 1260. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award within that discretion. Graham v. Offshore Specialty Fabricators, Inc., 2009-0117 (La.App. 1st Cir.1/8/10), 37 So.3d 1002, 1018.

B. Kelly’s Personal and Medical History

At the time of trial, Kelley was 58 years old, married, and the father of two children — a 22-year-old daughter and a 3-year-old son. Kelley had been a district court judge in the 19th Judicial District Court for almost 19 years.
According to the record, prior to the incident in question, Kelley suffered from a myriad of health and physical issues. Kelley had multiple surgeries on his right knee, which all stemmed from a lacrosse injury. He also underwent gallbladder surgery in the early 1990s. Kelley also suffered from tinnitus (ringing in the ears), sleep deprivation/apnea, anxiety, stress, and blood pressure related dizziness and blurred vision. In 2007, Kelley sought medical treatment for anxiety, dizziness, blurred vision, disorientation, chronic sleep deprivation, | ^hypertension, an esophageal ulcer, balance issues, shortness of breath, chest pains, and numbness in both hands. Kelley admitted that all of these issues interfered to some degree with his quality of life.
In addition to these issues, Kelley also had low back problems and neck issues that he had suffered from for years. Kelley described his low back problem as stenosis in his low back that caused occasional leg numbness and severe low back pain that prevented him from sitting for more than two hours. Kelley reported that the only way he could get relief from the pain was to lie down on the floor in his office. Surgery was recommended for Kelley’s low back pain, but Kelley opted *541 for a more conservative approach with epidural steroid injections and a lumbar brace.
With regard to Kelley’s neck complaints before the incident, Dr. John R. Clifford, Kelley’s original treating neurosurgeon, testified that Kelley reported a longstanding history of chronic problems, referable to his neck, which related to an old fall and a history of football injuries. Upon examination, Dr. Clifford found degenerative disc osteophyte complexes at the C5-6 and C6-7 levels, which caused compression of the C6 and C7 nerve roots. Dr. Clifford explained that these types of degenerative changes occur as part of the natural aging process and can lead to issues in the neck. In September 2003, Dr. Clifford surgically removed the C5-6 and C6-7 discs, implanted a bone graft, and attached a plate with screws to secure everything. Based on the surgery performed, Dr. Clifford believed a 17 percent permanent impairment rating was appropriate for Kelley. Dr. Clifford indicated that following a surgery of the type he performed on Kelley, he would normally advise his patients not to lift anything over 35 pounds, not to stress their neck to extreme ranges of motion, not to sleep on their stomach with their head turned to |19the side, and to avoid anything that would stress the vertebrae. He would also typically advise patients to stay away from playing golf for at least a year to a year and a half. Dr. Clifford could not recall if he specifically mentioned anything to Kelley about any of these restrictions following the 2003 surgery.
Kelley returned to see Dr. Clifford in June 2006 and again in August 2006. At the June visit, Kelley reported that his neck symptoms had reappeared about six to eight weeks prior to that visit. Kelley reported pain at the base of his neck and down between the shoulder blades, low back pain that was activity related, and posterior arm tingling on the left side. He also stated that the tip of his thumb felt like there was something being jammed under his fingernail. In August, Kelley reported an increase in neck pain. Upon examination, Dr. Clifford noted muscle spasm and restricted range of motion. There was no motor weakness or sensory deficit noted. Dr. Clifford ordered additional studies of the lumbar and cervical spine, but Kelley never returned to see Dr. Clifford.
Following the 2008 incident at the gas station, Kelley had increased neck pain. He began treating with Dr. Kelly Scrantz, the neurosurgeon who took over for Dr. Clifford after his retirement. Studies revealed that Kelley’s spine was structurally intact and that there was no fracture of the fusion that had been put in place by Dr. Clifford. Dr. Scrantz opined that the C6 nerve root, which had been damaged before, was re-injured in this incident. Kelley initially tried conservative treatment with Dr, Scrantz, but that failed to produce favorable results.
In May 2009, Dr. Scrantz performed surgery at the C5-6 and C6-7 levels, the same levels that Dr. Clifford had operated on in 2003. However, Dr. Scrantz approached the area from the back of the neck, whereas Dr. Clifford had approached the neck from the front during his procedure. Dr. Scrantz testified that |gnKelley had some narrowing on the left side that was causing tightness around the C6 nerve root. To relieve the tightness, Dr. Scrantz drilled two punch holes at the C5-6 and C6-7 levels to remove the pressure on the nerve. He then reinforced the area with rods and screws. Although Dr. Scrantz opined that the surgery was a success, he did note that Kelley was left with some permanent nerve damage and was still in a considerable amount of pain.
*542 Nonetheless, at a follow-up visit at the end of May 2009, Dr. Scrantz felt like Kelley was doing “incredibly well.” He saw Kelley again in October 2009, at which time Kelley reported that he was doing well. He did not see Kelley again until September 2012, when a severe coughing episode from bronchitis manifested a spinal stenosis at the C4-5 level. This condition ultimately led to Kelley’s third surgery in October 2012. Dr. Scrantz indicated that he could not say with any degree of certainty that either the 2009 surgery or the injuries that resulted in the 2009 surgery necessitated the October 2012 surgery.
Kelley testified at trial regarding the impact this incident had on his everyday life. He indicated that the pain that he suffers from on a daily basis causes him to be exhausted and “testy” with his wife when he gets home after a long day. Kelley described a feeling of guilt because of not being able to be the parent that he should be to his young son. He explained that he is not able to do things with his son that he was able to do with his daughter when she was that age, like get down on the floor and play with him, carry him in the grocery store, or teach him how to play catch.
With regard to his physical activities, Kelley stated that before this incident he was very active, played golf “all the time,” and enjoyed fishing and duck hunting as often as he could. Kelley testified that since this incident, he has not |¾1 played any golf. He admitted to fishing whenever he could, but indicated that he was not able to cast accurately anymore. Kelley also stated that he still goes hunting, but uses a smaller gun so there is less recoil.
There was also testimony from two of Kelley’s friends from the legal community. David Guerry, Kelley’s ex-law partner, testified that prior to the May 2009 surgery, he and Kelley would play golf together whenever their schedules would permit. However, Guerry did acknowledge that once his friend became a judge, their golf outings had diminished. During the years 2002-2004, they only played five or six times a year. Guerry also mentioned card games that he and Kelley would participate in together on a regular basis until this incident. Steve Copley, a local attorney and family friend of the Kelleys, also testified on behalf of Kelley. Copley testified about the hunting and fishing that he and Kelley did together before this incident. He noted that there are times now that Kelley will go either fishing or hunting and just sit there and watch because the pain is too much for him.
Kelley’s wife, Angele Kelley, also testified about the changes in her husband since this incident. Mrs. Kelley noted that her husband is not as happy as he used to be and that he is frustrated with his inability to be active. She stated that he is in chronic pain and cannot be left with their son for more than two hours at a time because he gets tired. Mrs. Kelley testified that although they used to enjoy a very active lifestyle, including LSU tailgating, playing golf, duck hunting, fishing, and other social outings, their activity level has diminished and they do not do very much together anymore. However, Kelley admitted that after adopting their young son in 2010, he and his wife curtailed some of their social activities and simply did not go out as often.
|22Mrs. Kelley stated that her husband had not duck hunted since the accident and that although he still goes fishing, he does not go very often. Kelley’s testimony was a bit different in that regard. He indicated that he still does a lot of duck hunting, but just does not shoot as much anymore. With regard to fishing, Kelley stated that he still fishes a lot, but that he mostly *543 trolls or drops a line at a rig. In fact, Kelley told the jurors, “[i]f any of you raise your hand and say let’s go fishing right now, I’ll go with you.” He added, “I’m not going to stop living just because of this.... I’m not going to do it. I want to keep living.”
When asked about the level of activity he was able to engage in following the May 2009 surgery, Kelley admitted that within a few weeks of surgery, he attended a fundraiser for his judicial campaign, although he had to leave in the middle of the event because he was not feeling well. Also within that timeframe, he attended his daughter’s graduation. About four weeks following surgery, Kelley reported feeling well enough to go out onto his back porch and grill steaks. While outside, he decided to hose off the porch and he slipped and fell, injuring his left knee.
Kelley testified about another incident following the May 2009 surgery when he was on a fishing trip in October 2009. According to Kelley, “whether [he] was feeling well enough or not, [he] was going fishing.” Kelley testified that he caught what he estimated to be a 20-pound tuna. He noted that “[t]hey fight like a devil.... I mean, that is why they are fun to catch.” As a result, Kelley was sore and had a “flare-up of pulled muscles” that lasted about two weeks.
Kelley was also asked about other activities that he engaged in during the years following the May 2009 surgery. Kelley admitted to traveling to Point Clear, Alabama, or Sandestin, Florida, about three times a year during 2010 and 2011 for [^continuing legal education purposes. He also reported traveling to Pensacola Beach, Florida, and Orange Beach, Alabama, during that time. In addition to these beach trips, Kelley took a trip to Mexico, which included two travel days and three fishing days. And, in Spring 2013, Kelley’s daughter was the Queen of the Washington Mardi Gras, prompting a four-day trip to Washington D.C. to enjoy the festivities there.

C. Special Damages

On appeal herein, Kelley challenges the jury’s award of $130,500.00 for past medical expenses and $12,000.00 for future medical expenses. Prior to trial, the parties stipulated that the total amount of Kelley’s medical bills was $215,992.62; however, Skinner and USAA did not stipulate to causation. Under Louisiana law, a tort victim may recover past (from injury to trial) and future (post-trial) medical expenses caused by tortious conduct. However, the victim must establish that he incurred past medical expenses in good faith because of his injury and that future medical expenses will more probably than not be incurred. Menard v. Lafayette Ins. Co., 2009-1869 (La.3/16/10), 31 So.3d 996, 1006.
In order to recover, a plaintiff must prove, by a preponderance of the evidence, both the existence of the injuries and a causal connection between the injuries and the accident. Yohn v. Brandon, 2001-1896 (La.App. 1st Cir.9/27/02), 835 So.2d 580, 584, writ denied, 2002-2592 (La.12/13/02), 831 So.2d 989. The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. McNeely v. Ford Motor Co., Inc., 98-2139 (La.App. 1st 12/28/99), 763 So.2d 659, 667, writ denied, 2000-0780 (La.4/28/00), 760 So.2d 1182. A tortfeasor is | pliable only for damages caused by his negligent act. He is not liable for damages caused by separate, independent, or intervening causes. Hence, the plaintiff has the burden of proving that *544 his injuries were not the result of separate, independent, and intervening causes. Shows v. Shoney’s, Inc., 98-1254 (La.App. 1st Cir.7/29/99), 738 So.2d 724, 732.
In the present case, Kelley submitted a list of medical expenses, including physician fees, hospital fees, and pharmacy bills. Kelley’s medical expenses date back to April 4, 2008, the date of Kelley’s first office visit with Dr. Scrantz. The expenses track Kelley’s course of treatment with Dr. Scrantz through the years, including numerous physical therapy visits, epidural injections, and the expenses associated with Kelley’s May 2009 surgery. Also included in Kelley’s medical expenses are the hospital charges and physician fees associated with the October 2012 cervical fusion at C3-4 and C4-5. When asked about the October 2012 surgery, Dr. Scrantz could not say with certainty that either the 2009 surgery or the injuries that resulted in the 2009 surgery necessitated the October 2012 surgery.
When medical expenses have been incurred for the treatment of multiple injuries or conditions, and a jury finds that some, though not all, of those injuries or conditions were caused by the event in question, the jury’s great discretion permits it to award something less than the full amount of the medical expenses. See Kaiser v. Hardin, 2006-2092 (La.4/11/07), 953 So.2d 802, 810-811 (per curiam). When reviewing a jury’s factual conclusions with regard to special damages, including the jury’s decision to award an amount less than the medical expenses claimed by a plaintiff, an appellate court must satisfy a two-step process based on the record as a whole: first, there must be no reasonable factual basis forj^the fact finder’s conclusions, and second, the finding must be clearly wrong. Kaiser, 953 So.2d at 810.
The jury awarded Kelley the sum of $130,500.00 in past medical expenses. Although it is not readily discernible from the record how the jury arrived at the $130,500.00 figure awarded to Kelley for past medical expenses, the award suggests that the jury did not believe that all of Kelley’s post-accident treatment was causally connected to the accident. Under the circumstances, the jury’s award of a portion of the medical expenses was not an abuse of its discretion, and illustrates the jury’s discretion to arrive at a verdict that is just. Applying the two-step process enumerated in Kaiser, and considering the record in its entirety, we are unable to say the jury abused its discretion in rendering an award of $130,500.00 for past medical expenses.
With regard to future medical expenses, the jury awarded Kelley $12,000.00. To recover such expenses, a plaintiff must establish that future medical expenses will, more probably than not, be medically necessary. A plaintiff shows this probability with supporting medical testimony and estimations of the probable cost of the expenses. Menard, 31 So.3d at 1006.
The medical testimony from Dr. Scrantz established that Kelley sustained permanent nerve damage as a result of the May 2009 cervical fusion, and that at the time of trial, Kelley was still in a considerable amount of pain for which he had been' prescribed pain medication, muscle relaxers, and nerve medication. This finding could lead to the implied conclusion that Kelley will need future medical care of some kind. However, the record does not establish, by medical testimony or otherwise, what that specific treatment is or the probable costs of that treatment. Thus, as is evident from its verdict of $12,000.00, the jury made a factual finding l^that, at the time of trial, Judge Kelley continued to suffer from injuries related to the accident *545 and would require some type of medical attention for a period of time after trial. But, the jury reasonably determined that Kelley did not prove what type of care would be “medically necessary” or that the estimated cost of this treatment was beyond its award of $12,000.00. Under these circumstances, we cannot say the jury was clearly wrong in limiting Judge Kelley’s future medical expense award to $12,000.00.

D. General Damages

Kelley maintains that the jury abused its discretion and committed manifest error in awarding damages that were excessively low. He further argues that given the wealth of evidence presented, there was no way that reasonable and fair-minded jurors could reach the conclusion that there was no compensable loss of enjoyment of life or future mental anguish,
The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. Jenkins v. State ex rel. Dept. of Transp. and Development, 2006-1804 (La.App. 1st Cir.8/19/08), 993 So.2d 749, 767, unit denied, 2008-2471 (La.12/19/08), 996 So.2d 1133. In comparison, loss of enjoyment of life refers to detrimental alterations of a person’s life or lifestyle or a person’s inability to participate in the activities or pleasures of life he enjoyed prior to the injury. McGee v. A C and S, Inc., 2005-1036 (La.7/10/06), 933 So.2d 770, 775. Separate awards for pain and suffering and loss of enjoyment of life are acceptable as such do not offend the existing concept of general damages. Id.
1271. Pain and Suffering
Louisiana Civil Code article 2324.1 provides: “In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.” With regard to review of an award of general damages, in Guillory, 16 So.3d at 1116-1117, the Louisiana Supreme Court stated:
This court has noted:
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
The role of an appellate court in reviewing a general damages award, one which may not be fixed with pecuniary exactitude, is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact.
* * *
Furthermore, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the [fact finder’s] choice between them cannot be manifestly erroneous or clearly wrong. Moreover, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case *546 differently. Reasonable persons frequently disagree about the measure of damages in a particular case, [citations omitted.]
In the instant case, Kelley contests the damage awards for past and future pain and suffering as excessively low. In reviewing a general damage award, a court does not review a particular item in isolation; rather, the entire damage 1 j>saward is reviewed for an abuse of discretion. Smith v. Goetzman, 97-0968 (La. App. 1st Cir.9/25/98), 720 So.2d 39, 48. “It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.” Youn, 623 So.2d at 1261.
The jury.awarded Kelley $150,000.00 in damages for past physical pain and suffering and $55,000.00 for future physical pain and suffering. As earlier noted, the jury’s past medical expense award suggests that the jury did not believe that all of Kelley’s medical expenses between the accident and the trial were causally connected to the incident in question. Based on our extensive review of the medical evidence in this record, and given the “particular injuries and their effects under the particular circumstances” on Kelley, we find no abuse of discretion in the jury’s award of $150,000.00 for past physical pain and suffering and $55,000.00 for future physical pain and suffering.
2. Loss of Enjoyment of Life/Future Mental Anguish
Louisiana courts have held that La. Civ. Code art. 2315 allows a victim to be compensated for damages caused by the delictual act of another, including damages for one’s loss of enjoyment of life. McGee, 933 So.2d at 774. Loss of enjoyment of life refers to the detrimental alterations of a person’s life or lifestyle or a person’s inability to participate in the activities or pleasures of life he enjoyed prior to the injury. In McGee, 933 So.2d at 775, the Louisiana Supreme Court further explained that “whether or not a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury.” Only if detrimental changes in a | ^victim's lifestyle (comparative to before the injuring event) would otherwise go uncompensated by other general damage awards is a separate award for loss of enjoyment of life warranted. Travis v. Spitale’s Bar, Inc., 2012-1366 (La.App. 1st Cir.8/14/13), 122 So.3d 1118, 1132, writs denied, 2013-2409 and 2013-2447 (La.1/10/14), 130 So.3d 327, 329. Whether damages for loss of enjoyment of life are recoverable depends on the particular facts of the case and should be left to the discretion of the fact finder on a case-by-case analysis. McGee, 933 So.2d at 779.
On appeal, Kelley challenges the lack of a jury award for loss of enjoyment of life. As discussed previously, even prior to this incident, Kelley suffered from a number of health and physical problems, including back and neck issues. Dr. Clifford had noted a progressive degenerative disc-osteophyte complex in Kelley’s, spine in 2003. Kelley underwent a discectomy and anterior fusion at C5-6 and C6-7 in 2003. Although the 2003 surgery provided some relief, Dr. Clifford assigned Kelley a 17 percent permanent impairment following the surgery. Moreover, the evidence revealed that Kelley reported a return of neck pain in 2006, almost two years before the incident in question.
There was much evidence presented to the jury regarding the alleged effect this *547 incident had on Kelley’s life. Testimony was presented regarding the impact on Kelley’s family life as well as his daily activities. In spite of Kelley’s May 2009 surgery, he continued to engage in many of the activities that he previously enjoyed, like fishing and hunting. He traveled regularly, even as far as Mexico on one occasion. The jury could have reasonably concluded that the injuries proven to have been sustained by Kelley did not cause him a detrimental lifestyle change warranting such an award and the record provides an evidentiary basis for the jury’s decision.
1 anKelley further argues that the jury abused its discretion by failing to award him any amount for future mental anguish. Kelley was awarded $150,000.00 for past physical pain and suffering, $55,000.00 for future physical pain and suffering, and $75,000.00 for past mental anguish. Based on our review of the record, we cannot say that the jury’s decision to not award Kelley any damages for future mental anguish was ah abuse of discretion when considered with the other awards and apparent findings of the jury.

Answer to Appeal

In an answer to the appeal by Skinner and USAA, Kelley argues that should this court decide that Skinner and USAA are not liable to Kelley because of prescription, then this court should render judgment in his favor and against his UM carrier, General, as General was timely sued within the prescriptive period. Due to our determination herein that Kelley’s claims against Skinner and USAA were not prescribed, and are thus liable to Kelley for the full amount of the judgment, the arguments raised in Kelley’s answer to appeal are moot.
CONCLUSION
For all of the above and foregoing reasons, the September 4, 2013 judgment of the trial court, which overruled the peremptory exception raising the objection of prescription filed by Skinner and USAA, rendered judgment in favor of Kelley and against Skinner and USAA, in solido, for $422,500.00, and dismissed General’s cross claim against Skinner and USAA as moot and Kelley’s claims against General with prejudice, is affirmed. All costs of this appeal are assessed to Katherine Skinner and her liability insurer, USAA Casualty Insurance Company.
AFFIRMED.
PETTIGREW, J., concurs in part and dissents and assigns reasons.

. In the pleadings, Skinner's automobile liability insurer was mistakenly referred to as “United Services Automobile Association.”

. According to the petition, defendants Gil-barco and Catlow were responsible for the manufacture of the allegedly defective hose, which presented an unreasonable risk of injury, and Exxon was allegedly negligent in failing to remove the defective hose from the premises. The petition further alleged that Hall was responsible for the negligent maintenance of the gas pump.

.General filed a cross claim against Skinner and USAA, seeking indemnity and contribution for any amounts for which it may be held .liable as a result of the demands of Kelley in 'the original suit.

. At the time of this appeal, Skinner, USAA, and General were the only remaining defendants in the lawsuit. On September 11, 2009, Kelley voluntarily dismissed Gilbarco from the proceedings; and on March 19, 2012, the trial court granted summary judgment in favor of the three remaining corporate defendants, Catlow, Exxon, and Hall, dismissing, with prejudice, Kelley’s claims against them based on their lack of liability.

. At the same hearing on July 25, 2012, the trial court heard arguments on Kelley’s motion for partial summary judgment on . the issue of liability, which was also denied in the July 27, 2012 judgment. In addition, Skinner and USAA applied for supervisory writs to this court from the trial court ruling on the objection of prescription. This court declined to exercise its supervisory jurisdiction, noting that the parties had "an adequate remedy by review on appeal.” Kelley v. General Ins. Co. of America, et al., 2012-1402 (La.App. 1st Cir. 11/19/12) {unpublished writ action). Ms. Skinner and USAA were also unsuccessful in their writ application to the supreme court. Kelley v. General Ins. Co. of America, 2012-2722 (La.2/8/13), 108 So.3d 91.

. See La. C.C. art. 3462 (providing, in pertinent part, that "[plrescription is interrupted ... when the obligee commences action against the obligor, in a court of competent jurisdiction and venue”); La. C.C. art. 1799 (stating that "[t]he interruption of prescription against one solidary obligor is effective against all solidary obligors and their heirs”); La. C.C. art. 3503 (providing, in pertinent part, that ”[w]hen prescription is interrupted against a solidary obligor, the interruption is effective against all solidary obligors and their successors”).

. We recognize that a timely filed lawsuit against ,a tortfeasor would also interrupt the running of prescription against all joint tort-feasors pursuant to La. C.C. art. 2324(B) and (C). In this case, as previously noted, all of the corporate defendants who were timely sued were dismissed from this action prior to trial apparently based on their lack of liability. As such, those defendants were neither joint nor solidary obligors and thus, the timely suit against them could not serve to interrupt prescription as to Skinner or USAA. See Renfroe v. State, Dept. of Transportation and Development, 2001-1646 (La.2/26/02), 809 So.2d 947, 950. General, the only remaining defendant who was timely sued, was not a tortfeasor, but rather, was Kelley's UM carrier. Thus, La. C.C. art. 2324(C) is inapplicable herein. The timely filed lawsuit against General could not serve to interrupt prescription as to Skinner or USAA under La. C.C. art. 2324(C) because General was not a joint tort-feasor with Skinner or USAA.

. At the pertinent time in Hoefly, the definition concerning solidary obligations for obli-gors was set forth in La. C.C. art. 2091. However, the current definition is set forth in La. C.C. art. 1794, which “restates the principles contained in [former La.] C.C. [a]rt. 2091 *535 ... [and] does not change the law.” La. C.C. art. 1794, Revision Comments — 1984. Accordingly, the analysis in Hoefly regarding solidary obligations for obligors remains applicable.

. There is no dispute herein that the damages awarded to Kelley by the jury were within USAA's policy limits.

. Louisiana Revised Statute 22:1406(D) was redesignated as La. R.S. 22:680 by 2003 La. .Acts, No. 456 § 3, and thereafter, La. R.S. 22:680 was redesignated as La. R.S. 22:1295 by 2008 La. Acts, No. 415, § 1 & 3, effective January 1, 2009.

. See footnote 10.

. Louisiana Revised Statutes 9:5629 provides: "Actions for the recovery of damages sustained in motor vehicle accidents brought pursuant to uninsured motorist provisions in motor vehicle insurance policies are prescribed by two years reckoning from the date of the accident in which the damage was sustained."

. The court also stated in Rizer that once the action against the UM carrier was allowed to prescribe, it could not thereafter be revived by the filing of an action against a solidary obli-gor. Rizer, 669 So.2d at 390-391. Although the action against the tortfeasor was still alive because it had been interrupted by the timely-filed action against the tortfeasor's liability insurer, which was solidarily liable with the tortfeasor, once prescription extinguished the cause of action against the UM carrier, the subsequent timely-filed action against the tortfeasor (who was the UM carrier’s solidary obligor under Hoefly) could not revive the *538 already prescribed action against the UM carrier. Rizer, 669 So.2d at 391.

. We recognize that the Louisiana Supreme Court did not overrule Hoefly in either Rizer or Fertitta. See Fertitta, 462 So.2d at 163 (reaffirming Hoefly) and Ausama v. Frontier Public Coach Tours, Inc., 97-1271 (La. App 1st Cir. 5/15/98), 712 So.2d 653, 656 (noting that neither Hoefly nor Rizer) have been overruled and that under Hoefly, a tortfeasor and the plaintiffs UM carrier are solidary obligors and under Rizer a tortfeasor's liability insurer and the plaintiff's UM carrier are not solidary obligors.