STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2024 CA 0303

THERESA NAQUIN

VERSUS

CHURCH MUTUAL INSURANCE COMPANY,
COVENANT CHRISTIAN ACADEMY OF HOUMA, LOUISIANA,
AND FIRST BAPTIST CHURCH OF HOUMA

*Judgment Rendered:* DEC 3 0 2024

* * * * * * * *

Appealed from the
32nd Judicial District Court
In and for the Parish of Terrebonne
State of Louisiana
Case No. 187356, Division D

The Honorable David W. Arceneaux, Judge Presiding

* * * * * * * *

Sidney W. Degan, III
Travis L. Bourgeois
Candace C. Chauvin
New Orleans, Louisiana
    and
Azelie Ziegler Shelby
Sarah K. Lunn
Kathryn C. Adams
Baton Rouge, Louisiana

Megan C. Kiefer
Nat G. Kiefer, Jr.
Chris M. Short
New Orleans, Louisiana

Counsel for Defendants/Appellants
Church Mutual Insurance
Company and Covenant Christian
Academy of Houma

Counsel for Plaintiff/Appellee
Theresa Naquin

* * * * * * * *

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

**THERIOT, J.**

In this suit by a janitorial worker for damages resulting from a fall on school premises, the trial court rendered judgment in favor of the plaintiff in accordance with a jury verdict. For the reasons set forth herein, we affirm.

**FACTS AND PROCEDURAL HISTORY**

Covenant Christian Academy ("CCA") is a private school located in Houma, Louisiana. The school is operated on premises owned by First Baptist Church of Houma ("FBC") and leased to CCA. Pursuant to the lease agreement between CCA and FBC, FBC is to provide "all major maintenance on the buildings and property," and CCA is to provide "routine [maintenance] such as cleaning, changing of light bulbs, air filters[,] etc."

In furtherance of its obligations under the lease, CCA contracted with Enmon Enterprises, LLC d/b/a Jani-King of South Louisiana ("Enmon") for commercial cleaning services for the school premises five times per week, 180 days per school year. The CCA-Enmon contract listed the services to be performed in various areas of the school, including emptying all trash receptacles daily and removing trash to a collection point.

According to the CCA-Enmon contract, the cleaning services were to be provided through Enmon's authorized franchisee, who was neither named in the contract nor a party to the contract. The CCA-Enmon contract provided that the cleaning services at CCA would be performed by personnel selected and designated by Enmon's authorized franchisee and that the authorized franchisee and its personnel would be independent contractors, not employees of CCA, and would not be within the coverage of CCA's workers' compensation insurance. The CCA-Enmon contract provided that, in addition to personnel, the authorized franchisee would furnish all necessary equipment, tools, and cleaning supplies.

2

Enmon selected Karl and Denise Adams d/b/a Jani-King ("Jani-King") as its authorized franchisee for the CCA contract. Karl explained that once Enmon selected Jani-King to provide the services required under its contract with CCA, he was free to decide how many of his employees, if any, to use to provide the services. At the time of the accident at issue herein, he had two of Jani-King's employees assigned to clean CCA.

Theresa Naquin began working for Jani-King in February 2019. In the course of her employment with Jani-King, Naquin was assigned to perform commercial cleaning services at several locations, including CCA. Naquin was not familiar with the CCA-Enmon contract or its requirements, but her supervisor at Jani-King, Sherry Boudreaux, worked alongside her for the first few weeks at CCA and showed her what she needed to do to clean the school.

One of Naquin's responsibilities when cleaning CCA was to take out all of the trash each day, a task that required multiple trips to the dumpster. Jani-King supplied two garbage carts for its employees' use in collecting trash and transporting it to the dumpster at CCA. These garbage carts were stored at CCA, along with the other supplies provided by Jani-King for the job. According to Naquin, one of the Jani-King garbage carts had a "wobbly" wheel that would spin around, making the cart drive "crazy." She asserts that she reported this issue with the garbage cart to Karl, and although he told her that he had a new wheel and would change it, he never did.

On the evening of March 11, 2019, Naquin tripped and fell while taking trash out to the dumpster at CCA. Naquin sent a text message to Karl, asking him to have CCA fix a broken light fixture by the dumpster, and explaining that she had fallen in the dark. She denied being injured in this fall. The following afternoon, Karl sent a text message to Jason Hutchinson, CCA's principal, stating that Naquin had fallen and asking him to "get the light in back by [the] dumpster

3

fixed." Hutchinson did not immediately do so, although he admitted that this sort of routine maintenance is his responsibility.

On March 14, 2019, Naquin was cleaning CCA along with her co-worker, Charlotte Hendon. Naquin went out to the dumpster alone around 7:35 p.m. to empty her garbage cart. As she pushed the full cart towards the dumpster, the cart tipped over and she fell, landing on her back. After falling, she sat on the ground for a couple of seconds, then got up and collected the trash that had fallen out of the cart. Naquin's knee and lower back hurt, so she sat back down again until Hendon came outside and found her. Hendon helped her empty the cart and clock out and then helped her to the car and brought her to the emergency room. Naquin notified Karl about her second fall and reminded him again that the non-working light in the dumpster area really needed to be fixed.

After the accident, Naquin filled out an accident report for Jani-King, in which she described her fall as follows:

> I was taking the garbage out to the dumpster. As I was going down the slope the cart started rolling down and I . . . tripped. I tried to stop it . . . from going and I was pushing it. I couldn't see too good from it being dark outside and the light not working and the cart rolled to the side and I fell with the cart.

On October 24, 2019, Naquin filed a petition for damages against FBC, CCA, and their insurer, Church Mutual Insurance Company (collectively referred to herein as "CCA") for her injuries resulting from the March 14, 2019 fall.[1] Naquin's petition alleges that her fall and the injuries she sustained were the result of an unreasonably dangerous condition on the premises, which she identified as "insufficient lighting of the dumpster area."

In response to Naquin's petition, CCA denied that an unreasonably dangerous condition existed on its premises and alternatively alleged that any defective or dangerous condition on the premises was open and obvious. CCA

---

[1] Jani-King's workers' compensation insurer, LM Insurance Corporation, intervened in the suit to recover the workers' compensation benefits it paid to Naquin as a result of the fall.

4

further alleged that Naquin's fall resulted from the negligence of other parties, including Naquin herself, who failed "to see what she should have and do what she should have done," and that her exclusive remedy was under the Louisiana Workers' Compensation Act.

CCA also filed a third-party demand against Enmon, alleging that Naquin's fall was caused in whole or in part when the garbage cart she used to transport trash to the dumpster lost a wheel. CCA alleged that the garbage cart was supplied in accordance with the parties' contract and that Enmon breached the parties' contract by failing to ensure that the equipment provided was safe and free of dangerous conditions. CCA later amended its third party demand to add allegations that Enmon was negligent and breached the parties' contract by selecting Jani-King as its authorized franchisee and by failing to properly hire, train, and/or supervise its employees, agents, subcontractors, dual employees, borrowed employees, and/or independent contractors to provide services pursuant to the contract.[2]

On January 11, 2021, Naquin supplemented and amended her petition to include additional allegations about the nature of the unreasonably dangerous condition on CCA's premises, i.e., that the unreasonably dangerous condition on CCA's premises was comprised of "insufficient lighting of the dumpster area, design or construction of the dumpster area, [and] the condition of the premises surrounding the ramp of the dumpster area."[3] Naquin supplemented and amended her petition a second time on March 1, 2021, adding Karl and Denise Adams d/b/a

---

[2] The trial court later sustained an exception of no cause of action as to the claims in CCA's third party demand and dismissed CCA's claims against Enmon.

[3] These new allegations of defects in the dumpster area appear to refer to a missing chunk of concrete at the edge of the sidewalk leading to the dumpster and the slope and cross-slope of the sidewalk.

Jani-King and LM Insurance Corporation as defendants and further alleging that a broken wheel on the garbage cart provided by Jani-King contributed to her fall.[4]

CCA filed two motions for summary judgment. In the first motion, CCA alleged that Naquin cannot prove the existence of a defect on the premises or that the alleged defect caused the accident. In the second motion, CCA alleged that it is entitled to tort immunity under the Louisiana Workers' Compensation Act because Naquin was an independent contractor performing manual labor at the time of her alleged accident. Both motions were denied by the trial court, and the matter proceeded to a jury trial on the merits.[5]

Prior to the start of trial, CCA stipulated to a number of facts, following which FBC was voluntarily dismissed from the suit, to wit: (1) CCA had custody of the sidewalk and lighting in the area where the accident occurred and was responsible for routine maintenance of the property leased from FBC; (2) CCA's responsibility for routine maintenance included changing burned out light bulbs and repairing cracks or holes in the sidewalk in the area where the accident occurred; and (3) to the extent that the jury finds the sidewalk or lighting conditions to be defective or hazardous, there was no fault on behalf of FBC or any of its employees. The parties also stipulated to the amount of Naquin's recoverable past medical expenses ($120,086.77) and stipulated that the amount of Naquin's future medical expenses would be limited to $150,000.00, regardless of the jury award.

---

[4] Naquin further alleged that Jani-King's failure to repair the cart despite prior notice of problems with the wheel was an intentional act and that Enmon is liable for Jani-King's actions as a result of the franchisor-franchisee relationship.

[5] There were a number of other motions and exceptions before the trial court at the hearing on CCA's motions for summary judgment, including a motion for summary judgment filed by Jani-King on the issue of tort immunity. The trial court granted Jani-King's motion and dismissed all claims against Karl and Denise Adams d/b/a Jani-King with prejudice.

6

A jury trial was held on Naquin's claims[6] on May 8-12, 2023. At the close of Naquin's case, CCA moved for a directed verdict on the grounds that Naquin did not carry her burden of proof on her claims arising from premises liability because she was aware of the allegedly dangerous conditions on the school premises, i.e., the lack of lighting in the dumpster area and the missing chunk of concrete at the edge of the sidewalk leading to the dumpster. The trial court denied the motion, noting that reasonable jurors could reach different conclusions on the premises liability issue. At the conclusion of the trial, the jury returned a verdict that both CCA and "either Karl Adams, doing business as Jani-King, or Enmon Enterprises" were at fault in the accident, but that Naquin was not at fault. The jury allocated 90% of the fault to CCA, 0% of the fault to Naquin, and 10% of the fault to "Karl Adams, doing business as Jani-King, and/or Enmon Enterprises." The jury also found that the March 14, 2019 accident caused injury or damage to Naquin in the following amounts:

| | |
|---|---|
| Past Medical Expenses: | $120,045.14 |
| Future Medical Expenses: | $300,000.00 |
| Past Physical and Mental Pain and Suffering: | $100,000.00 |
| Future Physical and Mental Pain and Suffering: | $310,000.00 |
| Loss of Enjoyment of Life: | $0 |
| Past Lost Wages | $34,252.69 |

Thereafter, the trial court signed a judgment dated June 16, 2023 in favor of Naquin and against CCA for the total amount of $642,868.05,[7] plus judicial interest and costs.

CCA filed a suspensive appeal, raising the following assignments of error:

---

[6] The trial court noted at the start of trial that LM Insurance Corporation's intervention would be handled separately following the jury trial.

[7] This sum represents CCA's 90% of the damages awarded by the jury, after reducing the future medical expenses award in accordance with the parties' stipulation.

1. The Trial Court Erred in Denying Defendants' Motion for Summary Judgment Regarding Absence of a Defective Condition and/or Open and Obviousness.

2. The Trial Court Erred in Denying Defendants' Motion for Summary Judgment Regarding Tort Immunity.

3. The Trial Court Erred in Denying a Directed Verdict.

4. The Jury Verdict Was Tainted by Erroneous Instructions and an Erroneous Verdict Form.

5. The Jury Erred in finding [CCA] at Fault.

6. The Jury Erred in Failing to Apportion Fault to Plaintiff, and Greater Fault to Enmon and Adams, and, as Separate Entities.

7. The Jury Erred in Finding Naquin's Injuries Were Caused by the Accident.

8. The Jury's Award of Damages is Erroneous or Excessive.

Naquin answered the appeal, arguing that the jury erred in failing to make any award of damages for loss of enjoyment of life and seeking amendment of the judgment to award her $100,000.00 for loss of enjoyment of life.

## DISCUSSION

### *Tort Immunity (Assignment of Error No. 2)*

CCA argues on appeal that the trial court erred in denying its motion for summary judgment on the issue of tort immunity under the Louisiana Worker's Compensation Law.

Generally, an appeal may not be taken from the trial court's denial of a motion for summary judgment. See La. C.C.P. art. 968 ("An appeal does not lie from the court's refusal to render any judgment on the pleading or summary judgment."). However, the denial of a motion for summary judgment may be reviewed on an appeal of a final judgment in the suit when the issue raised in the motion for summary judgment is raised again on appeal. *Arceneaux v. Arceneaux*, 2022-0814, p. 33 (La.App. 1 Cir. 4/3/23), 364 So.3d 529, 550, *writ denied*, 2023-00641 (La. 9/6/23), 369 So.3d 1271. When an unrestricted appeal is taken from a

8

final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings, in addition to review of the final judgment. *Id.* Nevertheless, the Louisiana Supreme Court has made it clear that after a full trial on the merits, the standard of review utilized in reviewing the denial of a motion for summary judgment is not the same standard of review utilized by appellate courts in reviewing the grant of a summary judgment. The Louisiana Supreme Court has explained that "once a case is fully tried, the affidavits and other limited evidence presented with a motion for summary judgment-later denied by the district court-are of little or no value." *Hopkins v. American Cyanamid Company*, 95-1088, p. 13 (La. 1/16/96), 666 So.2d 615, 624. Instead, the entire record should be reviewed by an appellate court. *Id.*

Thus, while the issue of tort immunity raised by CCA's motion for summary judgment is properly before us in this appeal, the limited evidence before the trial court at the time of its pre-trial ruling denying the motion and the de novo standard of review for summary judgment are no longer pertinent. The issues raised by CCA in its motion for summary judgment must be considered by this court after review of the entire record. See *Arceneaux*, 2022-0814 at p. 34, 364 So.3d at 551.

Louisiana Workers' Compensation Law is a quid-pro-quo system that affords the injured worker with certain but limited benefits in exchange for the general immunity from tort liability granted to the employer. Nevertheless, the immunity provisions of the Louisiana Workers' Compensation Law derogate from the delictual rights of injured workers existing in the Louisiana Civil Code, and, therefore, must be narrowly construed to make the least, rather than the most, change in the existing body of law. Accordingly, every presumption should be on the side of preserving the general tort or delictual rights of an injured worker against the actual wrongdoer, in the absence of explicit statutory language limiting or excluding such rights. *Champagne v. American Alternative Insurance Corp.*,

9

2012-1697, pp. 6-7 (La. 3/19/13), 112 So.3d 179, 184. A party seeking to avail itself of workers' compensation immunity from tort liability has the burden of proving entitlement to such immunity. *Champagne*, 12-1697 at p. 4, 112 So.3d at 182-83.

Although Naquin was an employee of Jani-King, an authorized franchisee of the company that CCA contracted with for commercial cleaning services, CCA asserts that it is entitled to tort immunity in this matter because Naquin is covered by the provisions of the Louisiana Workers' Compensation Law pursuant to the manual labor exception set forth in La. R.S. 23:1021(7).

Section 23:1021(7) defines "Independent contractor" for purposes of the Louisiana Workers' Compensation Law:

> "Independent contractor" means any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished, and are expressly excluded from the provisions of [the Louisiana Workers' Compensation Law] unless a substantial part of the work time of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of [the Louisiana Workers' Compensation Law].

See *McBride v. Old Republic Insurance Co.*, 55,772, p. 27 (La.App. 2 Cir. 10/9/24), --- So.3d ---, ---. In other words, an independent contractor who is engaged primarily in manual labor has a claim for workers' compensation against his principal, and that principal is immunized from a negligence suit. See La. R.S. 23:1032; *Jorge-Chavelas v. Louisiana Farm Bureau Cas. Ins. Co.*, 917 F.3d 847, 852 (5th Cir. 2019). Pertinent to this case, cleaning services have been held to be manual labor. *Rosales v. American Liberty Ins. Co.*, 23-49, p. 9 (La.App. 5 Cir. 10/31/23), 374 So.3d 203, 210-11.

In *Jorge-Chavelas*, the court considered whether Louisiana's choice to extend workers' compensation coverage – usually reserved for employees – to one

10

class of independent contractors (those engaged primarily in manual labor) also applies to the employees of those independent contractors, thereby immunizing the principal from tort liability. The court in *Jorge-Chavelas* began its analysis with the text of the statute, noting that while La. R.S. 23:1021(7) excludes most independent contractors from the workers' compensation regime, it grants coverage to independent contractors who spend a substantial part of their work time providing manual labor. In either case, the court noted that the text of Section 23:1021(7) addresses only *independent contractors*, i.e., "any person who renders service . . . for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished." See *Jorge-Chavelas*, 917 F.3d at 852. The court also relied on the ruling of the Louisiana Supreme Court in *Lushute v. Diesi*, 354 So.2d 179 (1977). In *Lushute*, the court reviewed the history and statutory scheme of the Louisiana Workers' Compensation Law and concluded that an independent contractor is covered under the Louisiana Workers' Compensation Law only when a substantial part of his work time is spent in manual labor in carrying out the terms of *his contract* with the principal and when the work performed by him is part of the principal's trade, business, or occupation. *Lushute*, 354 So.2d at 182. Based on this analysis, the court in *Jorge-Chavelas* concluded that where the employee of an independent contractor has not entered into an express or implied contract with his employer's principal, the employee is not the principal's independent contractor for purposes of the manual labor exception.[8] *Jorge-Chavelas*, 917 F.3d at 851-56; see also *Jorge-Chavelas v.*

---

[8] Although in *Courtney v. Fletcher Trucking*, 2012-0434 (La.App. 1 Cir. 12/21/12), 111 So.3d 411, 418 n. 6, this Court seemed to express the opinion that an individual need not be an independent contractor in order to fall under the manual labor exception, the Court's discussion in a footnote of the possible implications for employees of independent contractors was clearly dicta and not binding herein. See *Meaux v. Wendy's International, Inc.*, 2010-2613, p. 2 (La. 5/13/11), 69 So.3d 412, 413 (discussion of issue not essential to judgment constituted obiter dicta and is not binding).

11

*Louisiana Farm Bureau Casualty Insurance Company*, 307 F.Supp.3d 535, 553-54 (M.D. La. 2018), aff'd., 917 F.3d 847 (5th Cir. 2019).

The evidence before the court in this matter clearly established that Naquin was Jani-King's employee. This fact was expressly acknowledged by Hutchinson in an affidavit filed in support of the motion for summary judgment,[9] as well as by CCA in the following provision of the CCA-Enmon contract:

> 3.2. Authorized [Enmon] franchisees and any of its personnel are not employees of [CCA] but are independent contractors; and in this regard, such [Enmon] authorized franchisees and their employees will not be within the protection or coverage of [CCA's] workers' compensation insurance and no withholding of social security, federal or state income tax or other deductions shall be made from the sums agreed to be paid to [Enmon] herein, the same being contract payments and not wages.

In addition, although Enmon contracted with CCA for the provision of cleaning services, Naquin did not have any express or implied contractual agreement with CCA. Based on the evidence presented, we cannot say that CCA carried its burden of proving that Naquin spent a substantial part of her work time in manual labor in carrying out the terms of a contract between her and CCA and that the work performed by Naquin is part of CCA's trade, business, or occupation, thereby entitling CCA to tort immunity. Accordingly, the trial court did not err in denying CCA's motion for summary judgment on the issue of tort immunity. This assignment of error lacks merit.

### *Premises Liability (Assignments of Error Nos. 1, 3, and 5)*

In three separate assignments of error regarding CCA's liability for the existence of an unreasonably dangerous condition on the premises, CCA argues that the rulings of the trial court denying its motions for summary judgment and for directed verdict, as well as the jury's verdict, were erroneous. CCA argues that there was no defect on its premises, or if there was, it was open and obvious and not unreasonably dangerous. Although the applicable standards of review differ,

---

[9] Hutchinson's affidavit states that, to his knowledge, "Karl Adams provided his employees to clean [CCA]."

we will address these assignments of error together since all involve issues of premises liability.

Pursuant to Louisiana Civil Code article 2317, we are responsible, not only for the damage occasioned by our own act, but also for that which is caused by the act of persons for whom we are answerable or of the things that we have in our custody. However, the owner or custodian of a thing is only answerable for damage occasioned by its ruin, vice, or defect upon a showing that: (1) he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage; (2) the damage could have been prevented by the exercise of reasonable care; and (3) he failed to exercise such reasonable care. La. C.C. art. 2317.1.

A duty/risk analysis is utilized to determine whether liability exists. *Farrell v. Circle K Stores, Inc.*, 2022-00849, p. 5 (La. 3/17/23), 359 So.3d 467, 473. Under the duty/risk analysis, the plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of duty element); and (5) proof of actual damages (the damages element). If the plaintiff fails to prove any one element by a preponderance of the evidence, the defendant is not liable. *Id.*, 2022-00849 at p. 5-6, 359 So.3d at 473.

Regarding the duty element, the general rule is that the owner or custodian of property has a duty to keep the premises in a reasonably safe condition. *Farrell*, 2022-00849 at p. 6, 359 So.3d at 473. As previously noted, CCA stipulated that it was the custodian of the sidewalk and lighting in the dumpster area. As the custodian of the property, CCA owed a duty to Naquin to exercise reasonable care

13

to keep the premises free from an unreasonable risk of harm, to discover any unreasonably dangerous condition on the premises, and to correct the condition or warn potential victims of its existence. See *Bertrand v. Jefferson Arms Apartments, LLC*, 2022-1195, p. 8 (La.App. 1 Cir. 4/14/23), 366 So.3d 595, 602.

Naquin alleged that the unreasonably dangerous condition on CCA's premises was a missing chunk of concrete at the edge of a concrete sidewalk, which was concealed by darkness resulting from a non-working exterior light. She also alleged that the defective Jani-King cart contributed to her accident to some degree. CCA argues on appeal that there was no unreasonably dangerous condition on its premises because the "hole" in the sidewalk was open and obvious to all and Naquin was aware of both the hole and the darkness in that area of the premises at that time of day due to the non-working light.

Courts have adopted a risk/utility balancing test to determine whether a condition was unreasonably dangerous. This test considers: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of social utility or whether the activities were dangerous by nature. *Bertrand*, 2022-1195 at p. 9, 366 So.3d at 603. If the application of the risk/utility balancing test results in a determination that the complained-of hazard is not an unreasonably dangerous condition, a defendant is not liable because there was no duty breached. *Id.* The inquiry into whether a condition was open and obvious falls within the ambit of the second factor of the risk/utility balancing test, i.e., the likelihood and magnitude of the harm. *Id.*

*Utility of the Complained of Condition*

The alleged defects in this matter, i.e., the hole in the sidewalk and the non-working exterior light, were neither intended, nor present by design. If the

14

condition at issue was "meant to be there," it often will have social utility, and in the balancing test, weigh against a finding that the premises were unsafe. *Farrell*, 2022-00849 at p. 7, 359 So.3d at 474. Here, there is no evidence that there was any utility whatsoever to the presence of the hole in the sidewalk and the non-working exterior light. Jason Hutchinson, principal of CCA, testified that the hole in the sidewalk leading to the dumpster was caused by the installation of drainage underneath the sidewalk more than a year before Naquin's fall. Further, he testified that on the date of Naquin's accident, one of the two outdoor lights in the dumpster area, which was used "to illuminate that dumpster area and make sure that the walkway to the dumpster was properly and adequately illuminated," was not working due to a burned-out bulb. Since there is no evidence of any utility of the conditions, this factor clearly weighs in favor of the conditions being unreasonably dangerous.

*Likelihood and Magnitude of the Harm, including the Obviousness and Apparentness of the Condition*

The likelihood of the harm factor asks the degree to which the condition will likely cause harm. If it is likely to cause harm, that weighs in favor of finding it unreasonably dangerous. If it is unlikely to cause harm, that weighs in favor of it not being unreasonably dangerous. The magnitude of the harm factor asks whether the condition presents a risk of great or small injury and the likelihood of each. The likelihood and magnitude of the harm includes a consideration of the open and obviousness of the condition. *Farrell*, 2022-00849 at p. 7, 359 So.3d at 474. For a hazard to be considered open and obvious, it must be one that is open and obvious to all who may encounter it. *Farrell*, 2022-00849 at p. 13, 359 So.3d at 478. The more obvious the risk created by a condition, the less likely it is to cause injury because it will be avoided. *Id.* If a reasonable person would consider a hazard open and obvious, and would hence avoid the hazard, such weighs in favor of

15

finding the complained-of condition not unreasonably dangerous. *Id.* Further, the lack of reported complaints regarding a complained-of condition indicates a low risk of harm. *Campbell v. Hosp. Serv. Dist. No. 3 for Par. of Lafourche*, 2022-1118, p. 8 (La.App. 1 Cir. 8/1/23), 371 So.3d 543, 551.

CCA's expert witness, Dr. Jerry Householder, P.E., who testified as an expert in the fields of civil engineering and building codes on safety, opined that a person using the sidewalk at the date and time of Naquin's fall would have been able to see the hole in the sidewalk very easily and avoid it. Dr. Householder estimated that the hole was approximately sixteen or seventeen inches long, six inches wide at its widest point, and four or five inches deep.[10] Dr. Householder noted that while he might consider the hole in the sidewalk to be an unsafe condition if it was "pitch black" outside and a person walking to the dumpster could not see the hole, as Naquin alleged, he disagreed with her characterization of the lighting conditions in the dumpster area. Dr. Householder explained that, based on his analysis of the lighting conditions in the dumpster area as they would have been at the time and date of her fall, which took into account that the accident happened approximately twenty-four minutes after sunset and that there were other sources of light in the area, he was 99.99% certain that it was not "pitch black." Dr. Householder opined that the hole's location at the edge of the sidewalk (as opposed to in the middle of the sidewalk) also weighed in favor of the hole being visible and avoidable. He explained that the contrast between the color of the sidewalk and the grass next to it would have made the hole more visible, even in low light conditions. Further, addressing the assertion that the slope of the sidewalk, down towards the dumpster and to the right, caused the weighted-down garbage cart to pull to the right towards the hole in the concrete and contributed to

---

[10] By the time of Dr. Householder's inspection of the premises in January of 2023, the hole in the sidewalk had been filled in. As a result, Dr. Householder's testimony regarding the size of the hole at the time of Naquin's fall was an estimate based on measurements taken of the repaired area. However, Dr. Householder testified that the repaired area was slightly larger than the hole had been at the time of Naquin's fall because Hutchinson enlarged the hole slightly before filling it in so that the new concrete would adhere to the edges of the sidewalk.

Naquin's fall, Dr. Householder explained that the slope and cross-slope of the sidewalk are compliant with the International Building Code, and in addition, the degree of slope in the sidewalk in that area is "so small" that, while it may have caused the cart to pull "very slightly" to the right where the crack in the sidewalk was located, "unless [Naquin] start[ed] out way over on this side [she] would never hit that hole due to . . . the cross slope." Despite his opinion that the hole in the sidewalk was both visible and avoidable at the time of the accident, Dr. Householder conceded that the four-to-five-inch depth of the hole in the sidewalk was far in excess of several trip hazard standards and that the sidewalk, while safe, would have been safer with the hole filled in and more lighting in the area.

There is no dispute in this case that Naquin was aware of the hole in the sidewalk leading to the dumpster. She testified that the hole had been there the entire time she worked at CCA, and she walked past it multiple times each day in the daylight. While she acknowledged that the hole was distinctive during daylight hours due to the contrast between the light color of the sidewalk and the dark color of the ground below the hole, she explained that "when it's dark outside you really can't see it." Despite her awareness of the hole at the edge of the sidewalk, Naquin testified that she "just didn't think about it being there, [you] just do your job and go and you really don't think about it, you know."

In addition, it is undisputed that Naquin was aware of the non-working light in the dumpster area. She testified at trial that she had complained to Karl about the lack of lighting in the area several days before the accident. According to Naquin, after she tripped and fell in the dumpster area (not necessarily in the area of the hole) on the evening of March 11, 2019, "I told [Karl] about it, I said 'Y'all really need to get this light fixed . . . because it's dark back there.' And he said okay, he was going to get it done."

17

Despite her awareness of the hole in the sidewalk, Naquin maintained that she could not necessarily avoid the hole when taking the trash to the dumpster at night. She explained that she was prevented from avoiding the hole by the fact that it was "pitch black" in the dumpster area at night due to the non-working light, combined with the fact that she was trying to push a garbage cart that "steers to the right" because of a wobbly wheel. When questioned about whether she could have used a flashlight to help her see where she was going in order to avoid the hole that she knew was present, she explained that it took both of her hands to push the cart, so it was not possible for her to also hold a flashlight. She acknowledged that, on occasion, she and a co-worker had taken the trash out together so that one of them could hold a flashlight while the other pushed the cart, but she explained that they only did that "if we thought about it," and she took the trash out alone on the night of her fall.

Hutchinson testified there had been no other reported issues with the sidewalk in the dumpster area before or after Naquin's fall. Nevertheless, he acknowledged that it would be dangerous for a janitorial worker to attempt to navigate the garbage cart from inside the building to the dumpster in the dark, and he admitted that once he received notice from Karl that the light was not working and Naquin had tripped and fallen on March 11, 2019, he knew that there was "something dangerous going on on the campus of CCA." Despite this knowledge, he did not take action to fix the non-working light in the dumpster area until after Naquin's March 14, 2019 accident. He explained that he had relied on Karl's assurances that the Jani-King employees were being instructed not to go out to the dumpster area in the dark, and as a result, he thought he had time to figure out the lighting issue. Hutchinson testified that he had been told on several occasions that the Jani-King workers take trash out to the dumpster first, and it was his understanding that if the workers were unable to get all of the trash out to the

18

dumpster by dark, they would leave it in the custodial area until the next day. He testified that this belief was reinforced when, on a number of occasions, he arrived in the morning to find bags of trash stored in the garbage cart overnight. Hutchinson disagreed with Naquin's assertion that it was pitch black in the dumpster area on the night of her fall. He testified that he went out to CCA to look around several hours after her fall, after being notified by Karl of the accident, and although one of the two lights in the dumpster area was not working, there were other lights on in the area, and he could see well enough at that time to read the sign on the front of the dumpster.

Considering the facts of this case, including the size of the hole in the sidewalk, the non-working lights in the dumpster area, the fact that the janitorial workers frequently brought trash to the dumpster after dark, and the fact that Naquin fell while walking to the dumpster in the dark a few days prior to the accident at issue herein, we find the likelihood and magnitude of the harm to weigh in favor of the condition of the premises being unreasonably dangerous.

*Cost of Preventing the Harm*

Dr. Householder testified that, regardless of his opinion that a person walking on the sidewalk on the date and time of Naquin's fall should have been able to see and avoid the hole, his recommendation would have been for CCA to repair the sidewalk because it would be safer and it would have been very inexpensive to repair. Hutchinson testified that he changed the light bulb shortly after Naquin's March 14, 2019 fall, and the cost was under $30. Although the only reason the light was not working was that the bulb burned out, he explained that the repair was "a little more complicated" than just screwing in a new bulb and required a ladder and a screwdriver. Hutchinson also filled in the hole in the sidewalk after Naquin's fall. He testified that he filled in the hole in about an hour

19

and a half, using leftover cement that was on hand at the church. He estimated that if he had not had supplies on hand, the repair would have cost $7-$8.

Given the evidence as to the low cost and the fact that Hutchinson was able to complete all repairs himself in a short period of time, this factor also weighs in favor of the condition of the premises being unreasonably dangerous.

*Nature of Plaintiff's Activities in Terms of Social Utility or Whether the Activities were Dangerous by Nature*

The fourth and final factor of the risk/utility balancing test considers the nature of the plaintiff's activity in terms of social utility or whether the activities were dangerous by nature. In this case, Naquin was performing a required function of her employment by taking the trash to the dumpster. Although CCA argues that Naquin should have taken the trash out while it was still daylight so that she could better see where she was going or that she should have left any remaining trash inside until the next day in order to avoid going out to the dumpster in the dark, Naquin testified that she made several trips to the dumpster each day, and it was generally not possible to finish taking all of the trash out before dark. This testimony was supported by the testimony of her supervisor, Sherry Boudreaux, that taking all of the trash out at CCA typically required five or six trips to the dumpster, and that there were occasions where it was dark before she was able to get the last of the trash out to the dumpster. Boudreaux further testified that she never told Naquin not to take the trash out to the dumpster when it was dark outside because even when it was dark, she was still able to see to get to the dumpster. Similarly, Karl testified that he did not know whether anyone ever specifically told Naquin not to take the trash out to the dumpster after dark, and it was not against any specific Jani-King policy for Naquin to do so, although it would seemingly violate Jani-King's rule that employees should do what they can to avoid injury. Naquin denied ever being told that it would be acceptable to leave

20

any trash behind until the next day to avoid going to the dumpster after dark, and Karl confirmed that he was not aware of Jani-King employees ever doing this. Further, Naquin testified that taking out the trash was part of her job, and since she needed the job, she took the trash out to the dumpster each day despite the lack of lighting. While bringing trash out to a dumpster is not necessarily dangerous by nature, considering the evidence that Naquin believed that the lack of lighting in the dumpster area was dangerous and that she knew that she could bring a co-worker along with her to use a flashlight to guide her path, but went to the dumpster alone in the "pitch black," this factor is neutral.

In its first assignment of error, CCA argues that the trial court erred in denying its motion for summary judgment regarding the existence of an unreasonably dangerous condition. As previously discussed herein, while the denial of CCA's motion for summary judgment is properly before us on appeal, now that the matter has been fully tried on the merits, the issues raised by CCA's motion must be considered by this court after review of the entire record. See Arceneaux, 2022-0814 at p. 34, 364 So.3d at 551. Our review of the entire record reveals that genuine issues of material fact remained as to the existence of an unreasonably dangerous condition. Accordingly, summary judgment was not appropriate on this issue.

In its third assignment of error, CCA argues that the trial court erred in denying its motion for directed verdict. CCA's motion was based on the assertion that Naquin did not carry her burden of proof on premises liability because she was aware of the allegedly dangerous conditions on the school premises, i.e., the lack of lighting in the dumpster area and the missing chunk of concrete at the edge of the sidewalk leading to the dumpster.

A trial judge has much discretion in determining whether or not to grant a motion for directed verdict. A motion for directed verdict is appropriately granted

21

in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict; however, if there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. *Pratt v. Himel Marine, Inc.*, 2001-1832, p. 17-18 (La.App. 1 Cir. 6/21/02), 823 So.2d 394, 406, *writs denied*, 2002-2128, 2002-2025 (La. 11/1/02), 828 So.2d 571-572.

On appeal, the standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court concludes that reasonable people could not reach a contrary verdict. It is axiomatic that the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims. *Pratt*, 2001-1832 at p. 18, 823 So.2d at 406.

In denying CCA's motion for directed verdict, the trial court noted that reasonable jurors could reach different conclusions on the premises liability issue. Based on our review of the record and the applicable substantive law, we cannot say that the trial court abused its discretion.

Finally, in its fifth assignment of error, CCA argues that the jury erred in finding that it was at fault because there was no unreasonably dangerous condition on the premises, and if there was, it was open and obvious. Because the determination of whether a defective thing presents an unreasonable risk of harm encompasses an abundance of factual findings, which differ greatly from case to case, followed by an application of those facts to a less-than scientific standard, a reviewing court is in no better position to make the determination than the jury or trial court. Accordingly, the factfinder's unreasonable risk of harm determination is subject to the manifest error standard of review and should be afforded deference

22

on appeal. *Broussard v. State ex rel. Off. of State Bldgs.*, 2012-1238, p. 13 (La. 4/5/13), 113 So.3d 175, 185-86. Under the manifest error standard of review, a court of appeal may not set aside a jury's finding of fact unless it is manifestly erroneous or clearly wrong. *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989). The reviewing court must only decide whether the factfinder's conclusion was reasonable, not whether it was right or wrong. *Stobart v. State through DOTD*, 617 So.2d 880, 882 (La. 1993). In order to reverse a jury's factual finding as manifestly erroneous, an appellate court must find that the record, when reviewed in its entirety, (1) contains no reasonable factual basis for the jury's finding and (2) establishes the finding is clearly wrong. *Id.* The court of appeal must always be mindful that if the jury's findings "are reasonable in light of the record reviewed in its entirety ... [it] may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 882-83; *Rosell*, 549 So.2d at 844.

Following our review of the record in its entirety, and considering the risk/utility balancing test applicable to the determination of whether a condition is unreasonably dangerous, we conclude that the jury's finding that the missing chunk of concrete in the sidewalk and the non-working light fixture constituted an unreasonably dangerous condition is not manifestly erroneous or clearly wrong. Although CCA offered the opinion of an expert witness, Dr. Householder, that the hole in the sidewalk and the non-working light were not unreasonably dangerous, the jury is free to accept or reject in whole or in part any opinion expressed by an expert. The effect and weight to be given to expert testimony is within the jury's broad discretion. The jury may accept or reject any expert's view, even to the point of substituting its own common sense and judgment for that of an expert witness where, in the jury's opinion, such substitution appears warranted by the evidence as a whole. This decision will not be disturbed on appeal absent a finding

that the jury abused its broad discretion. *Dakmak v. Baton Rouge City Police Dept.*, 2012-1468, p. 7 (La.App. 1 Cir. 9/4/14), 153 So.3d 498, 505. Following our review of the record in its entirety, although we may have weighed the evidence differently, we cannot say the jury erred.

These assignments of error lack merit.

## *Causation (Assignment of Error No. 7)*

CCA also argues on appeal that the jury's finding that the March 14, 2019 accident caused injury or damage to Naquin was erroneous in that it was not supported by the evidence. CCA urges that Naquin's symptoms and the medical treatment she requires were not caused by the fall, but rather by vascular disease.

A factfinder's determination regarding causation, i.e., whether an accident caused the plaintiff's injuries, is a factual question that should not be reversed on appeal absent manifest error. *Moore v. Germania Select Ins. Co.*, 2023-0946, p. 3 (La.App. 1 Cir. 5/31/24), 391 So.3d 59, 62-63. Under the manifest error standard, the appellate court does not decide whether the factfinder was right or wrong; rather, it must consider the entire record to determine whether a reasonable factual basis exists for the factual finding, and whether the finding is manifestly erroneous or clearly wrong. *Moore*, 2023-0946 at p. 3, 391 So.3d at 63. Reasonable persons frequently can and do disagree regarding causation in particular cases, but where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Moore*, 2023-0946 at pp. 3-4, 391 So.3d at 63. Further, when findings are based on determinations regarding witness credibility, the manifest error standard demands great deference to the factfinder's findings, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Accordingly, for the reviewing court, the issue to be resolved is not whether the factfinder was wrong, but whether the factfinder's

24

conclusions were reasonable in light of the record viewed in its entirety. *Moore*, 2023-0946 at p. 4, 391 So.3d at 63.

CCA's argument on this issue is based on the testimony of its expert witness, Dr. Chad Domangue. Dr. Domangue, an expert in pain management and neurology, testified that although he was not Naquin's treating physician, he reviewed ten years of Naquin's medical records multiple times in order to formulate his opinion in this matter.[11] Dr. Domangue concluded, based on his review of Naquin's pre- and post-injury medical records, that her symptoms were more likely than not related to her vascular disease and not injuries incurred in the March 14, 2019 accident. Dr. Domangue testified that, in his opinion, Naquin would have "exactly the same" symptoms even if the March 14, 2019 accident had never occurred.

However, the jury was also presented with the expert testimony of Naquin's treating physicians, Dr. Deepak Awasthi and Dr. Suneil Jolly, that the March 14, 2019 fall caused Naquin's symptoms and need for treatment. Dr. Awasthi, a neurological surgeon, first saw Naquin on May 20, 2019 for complaints of neck and back pain radiating into her arms and legs that began after her March 14, 2019 fall. Dr. Awasthi testified that an MRI of Naquin's neck revealed a disc herniation, which was indenting the spinal cord and pushing on the nerves at the C4-5 level. In addition, Naquin had preexisting degenerative changes at the C5-6 level. Dr. Awasthi testified that, in his opinion, Naquin's C4-5 disc herniation was more likely than not caused by the March 14, 2019 fall, and the C5-6 changes were made symptomatic as a result of the March 14, 2019 fall. Dr. Awasthi's conclusion that the C4-5 herniation was the result of trauma, as opposed to degenerative changes, was based on both the history provided by Naquin and the appearance of the MRI

---

[11] Dr. Domangue testified that prior to being retained as an expert witness by CCA, he had previously seen Naquin on one occasion for approximately twenty to thirty minutes for a second medical opinion for workers' compensation.

25

scans, which suggest "a more acute event." After non-surgical management of Naquin's symptoms failed, Dr. Awasthi recommended that she undergo a spinal surgery, which he performed on September 1, 2020. Following the surgery, Naquin continued to complain of pain, which Dr. Awasthi explained was neuropathic pain resulting from internal damage to the nerves as a result of the nerves being compressed. Since Naquin's remaining issues would not require neurosurgical intervention, Dr. Awasthi referred her to a pain management physician for consultation and a possible spinal cord stimulator trial.

Dr. Jolly, an anesthesiologist and interventional pain management physician, testified that Naquin was referred to him by Dr. Awasthi following her neck surgery for pain management and a consultation for a spinal cord stimulator. Dr. Jolly performed a successful spinal cord stimulator trial on Naquin in August of 2021 and recommended that she undergo a permanent spinal cord stimulator implant surgery due to her ongoing complaints of pain in her upper extremities and the fact that the stimulator trial was the only thing that has provided Naquin with any relief. When asked about other potential causes of Naquin's symptoms, such as her vascular disease or a prior fall, Dr. Jolly noted that pain from vascular injuries typically increases gradually over the course of several years, and considering the sudden onset of Naquin's symptoms several days after the March 14, 2019 accident, he opined that his treatment of Naquin was more likely than not related to the potentially permanent nerve root injury resulting from the disc herniation sustained in the March 14, 2019 accident.

It is clear that the jury chose to credit the expert testimony of Naquin's treating physicians in concluding that the March 14, 2019 accident was the cause of Naquin's injuries and need for medical treatment. Based on our review of the record in its entirety, the jury's conclusion was reasonable, and this assignment of error lacks merit.

CCA also assigns error to the jury's allocation of fault, arguing that all or the majority of the fault should have been allocated to Naquin, Enmon, and Jani-King.

A jury's allocation of fault is a factual finding subject to the manifest error-clearly wrong standard of review. *Barber Bros. Contracting Co., LLC v. Capitol City Produce Co., LLC*, 2023-00788, p. 18 (La. 6/28/24), 388 So.3d 331, 347. In apportioning fault, the factfinder shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed. *Schexnayder v. Bridges*, 2015-0786, p. 12 (La.App. 1 Cir. 2/26/16), 190 So. 3d 764, 773. In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned by the factfinder, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. *Schexnayder*, 2015-0786 at p. 12, 190 So.3d at 773. If an appellate court finds a clearly wrong allocation of fault, the court should adjust the award, but then only to the extent of lowering or raising it to the highest or lowest point respectively that is reasonably within the factfinder's discretion. *Schexnayder*, 2015-0786 at p. 13, 190 So.3d at 773-74.

CCA argues that the jury erred in assessing 90% of the fault to CCA. In making this argument, CCA asserts that Dr. Householder deemed the sidewalk safe and the lighting sufficient; that the accident was actually caused by the defective cart and by Naquin's failure to follow her employer's methods and procedures regarding when and how to empty the trash; and that Naquin was aware of both the

hole and the non-working light, but despite that knowledge and a prior fall in the area, walked out to the dumpster in the dark again.

Although Dr. Householder did opine that the sidewalk area was safe at the time of Naquin's fall, this opinion was based on a variety of factors, including his conclusion that the hole in the sidewalk would have been visible to Naquin at the time of her fall in spite of the non-working light. He admitted that if the jury believed Naquin's testimony that it was "pitch black" outside and the hole could not be seen, then the sidewalk might be unsafe. Although Dr. Householder disagreed with Naquin's characterization of the lighting conditions, the jury could reasonably have believed Naquin's testimony that it was pitch black outside and the hole could not be seen. CCA also asserts that there was unrefuted testimony from Dr. Householder that the sidewalk was "compliant with all codes." While Dr. Householder testified that the width and slope of the sidewalk were code-compliant, he admitted that the 4-5" depth of the hole in the sidewalk was far in excess of several trip hazard standards.

In addition, there was conflicting testimony as to whether Naquin was instructed by anyone not to take the trash out after dark. The jury was certainly free to accept Naquin's testimony, which was supported by the testimony of Boudreaux, Hendon, and Karl, that she was never told not to take the trash out after dark and that she believed that she was required to bring all of the trash out to the dumpster before leaving work each day.

Although CCA argues that the jury erred in only allocating 10% of the fault to Enmon and/or Jani-King because Naquin's fall was actually caused by the defective wheel on the garbage cart provided by Jani-King, Naquin's trial testimony supports the finding that although the wobbly wheel made the cart more difficult to steer, the accident was actually caused when the wheel of the garbage cart hit the hole in the sidewalk in the dark, causing the cart to tip over and causing

Naquin to fall. This theory was further supported by Karl's testimony that after Naquin's accident, he discovered that the garbage cart's wheel had been broken off at the stem. Karl testified that he later found the wheel lying in the dumpster area, and upon inspection of the broken wheel, he believed that the wheel was broken after hitting something hard.

Considering the factors set forth above that may influence the factfinder's allocation of fault in light of the facts of this case, specifically, Hutchinson's testimony that once Karl informed him that the light was not working and that Naquin had fallen on March 11, 2019, he knew there was "something dangerous going on on the campus of CCA," as well as CCA's superior position to alleviate the unreasonably dangerous condition, and CCA's failure to do so despite the fact that the repairs could be made relatively easily and inexpensively, we cannot say that the jury's allocation of 90% of the fault to CCA was clearly wrong. This assignment of error lacks merit.

### Jury Instructions and Interrogatories (Assignment of Error No. 4)

CCA also assigns error to the trial court's collective reference to Enmon and Jani-King in the jury instructions and jury interrogatories. CCA urges that the jury should have been allowed to allocate liability to these separate and distinct entities separately and that it was legal error for the trial court to provide only one line for the jury to allocate fault to both defendants.

Louisiana Code of Civil Procedure article 1792(B) requires a trial judge to instruct jurors on the law applicable to the cause submitted to them. The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate. *Barber Bros.*, 2023-00788 at p. 9, 388 So.3d at 342-43. The question for the reviewing court is whether the trial judge adequately instructed the jury. *Barber Bros.*, 2023-00788 at p. 10, 388 So.3d at 342.

29

Adequate jury instructions are those that fairly and reasonably point out the issues and that provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error. *Barber Bros.*, 2023-00788 at p. 10, 388 So.3d at 342.

The giving of an allegedly erroneous jury instruction will not constitute grounds for reversal unless the instruction is erroneous, and the complaining party has been injured or prejudiced thereby. *Barber Bros.*, 2023-00788 at p. 10, 388 So.3d at 342. Louisiana jurisprudence is well-settled that a reviewing court must exercise great restraint before it reverses a jury verdict due to erroneous jury instructions. Trial courts are given broad discretion in formulating jury instructions, and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge. *Id.*, 2023-00788 at p. 10, 388 So.3d at 343.

When a reviewing court finds the jury was erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. *Id.*, 2023-00788 at p. 10, 388 So.3d at 343. To determine whether the trial court gave an erroneous jury instruction, reviewing courts must assess the targeted portion of the instruction in the context of the entire jury charge to determine if the

charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation. The ultimate inquiry on review is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. *Id.*, 2023-00788 at p. 11, 388 So.3d at 343.

In addition, the law is clear that the review function is not complete once error is found. Prejudice to the complaining party cannot automatically be assumed from the mere fact of an error. Instead, the reviewing court must then compare the degree of the error with the adequacy of the jury instructions as a whole and the circumstances of the case. *Id.* The manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. Thus, on appellate review of a jury trial, the mere discovery of an error in the trial judge's instructions does not of itself justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case. *Id.*

CCA argues on appeal that the trial court erred in instructing the jury because it referred to Enmon and Jani-King collectively at times, despite the fact that Enmon and Jani-King are separate and distinct entities with separate potential liability. Notably, the claims against Enmon in this matter were limited to claims that it was responsible for Jani-King's actions as a result of their franchisor-franchisee relationship. Reviewing the trial court's jury instructions as a whole, we find that they fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. Specifically, the trial court instructed the jury that "[i]f you come to a conclusion that [CCA] was negligent and you further conclude that either 1) Theresa Naquin or 2) Karl Adams, doing

31

business as Jani-King and Enmon Enterprises or both were negligent, you will be asked to assign percentages of fault to each party on the verdict form." While the instructions may have been clearer if the trial court had listed Enmon and Jani-King separately, CCA has not demonstrated how it was prejudiced by any possible trial court error in instructing the jury. In objecting to the trial court's jury instructions and interrogatories at trial, CCA argued that Enmon should not be aligned with Jani-King, but rather should be listed separately so that the jury could allocate fault to Enmon apart from Jani-King's fault. However, there was no evidence offered at trial of any negligence by Enmon separate from its affiliation with Jani-King, and counsel for CCA did not make any argument to the jury about any negligence on the part of Enmon in its closing argument. Under these circumstances, we cannot say that the trial court erred in instructing the jury or that there was any prejudice to CCA resulting from the jury instructions.

In addition, CCA argues that the jury interrogatories and verdict form used by the court, which referred to Enmon and Jani-King collectively, prevented the jury from allocating shares of negligence to each party at fault.

Under the guidelines of La. C.C.P. art. 1812,[12] the trial court is given wide discretion in determining and framing questions to be posed as special jury interrogatories, and absent some abuse of that discretion, this court will not set aside those determinations. *Schram v. Chaisson*, 2003-2307, p. 6 (La.App. 1 Cir. 9/17/04), 888 So.2d 247, 251.

If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on an applicable

---

[12] Under La. C.C.P. art. 1812, the court may submit to the jury written questions susceptible of categorical or other brief answer, or may submit written forms of the several special findings which might properly be made under the pleadings and evidence, or may use any other appropriate method of submitting the issues and requiring the written findings thereon, following which the trial court shall enter a judgment in conformity with the jury's answers and the applicable law. In a case to recover damages for injury, death, or loss, these questions to the jury shall include whether a party from whom damages are claimed, or the person for whom such party is legally responsible, was at fault, and if so, whether such fault was a legal cause of the damages, and if so, the degree of such fault, expressed in a percentage. Where appropriate under the facts of the case, the same questions shall be posed as to another party or nonparty or as to the plaintiff.

essential legal principle, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error. *Schram*, 2003-2307 at p. 7, 888 So.2d at 251.

Although CCA requested that the trial court list Enmon and Jani-King on separate lines on the verdict form for the determination of fault and allocation of percentages of fault, the verdict form used by the trial court asked the jury to determine whether "Karl Adams, doing business as Jani-King, or Enmon Enterprises" was at fault in this case and contained a single line for allocating a percentage of fault to "Karl Adams, doing business as Jani-King, and/or Enmon Enterprises." CCA urges that this constitutes reversible error, but does not explain how this verdict form was misleading or confusing to the jury or how the verdict was affected by the error. All parties/defendants were included on the verdict form, and the jury allocated 10% fault to "Karl Adams, doing business as Jani-King, and/or Enmon Enterprises," despite the fact that no evidence was presented at trial regarding any fault of Enmon separate from its responsibility arising from its relationship with Jani-King. Any possible error by the trial court in including both Enmon and Jani-King on a single line appears to be harmless to CCA and not an abuse of discretion. This assignment of error has no merit.

### Damages (Assignment of Error No. 8)

Both CCA on appeal and Naquin in her answer to the appeal assign error to the jury's award of damages. CCA argues that the jury's award for future physical and mental pain and suffering should either be stricken or reduced because the jury did not make any award for her loss of enjoyment of life, the award is not supported by the evidence, and Naquin was fully compensated by other awards. Conversely, Naquin urges that the jury erred in failing to award any amount for her loss of enjoyment of life.

33

Loss of enjoyment of life refers to detrimental alterations of a person's life or lifestyle or a person's inability to participate in the activities or pleasures of life he enjoyed prior to the injury. *Kelley v. General Insurance Company of America*, 2014-180, p. 28 (La.App. 1 Cir. 12/23/14), 168 So.3d 528, 546, *writs denied*, 2015-157, 2015-165 (La. 4/10/15), 163 So.3d 814, 816. Whether or not a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury. Only if detrimental changes in a victim's lifestyle (comparative to before the injuring event) would otherwise go uncompensated by other general damage awards is a separate award for loss of enjoyment of life warranted. *Travis v. Spitale's Bar, Inc.*, 2012-1366, p. 19 (La.App. 1 Cir.8/14/13), 122 So.3d 1118, 1132, *writs denied*, 2013-2409, 2013-2447 (La.1/10/14), 130 So.3d 327, 329. Whether damages for loss of enjoyment of life are recoverable depends on the particular facts of the case and should be left to the discretion of the factfinder on a case-by-case analysis. *Kelley*, 2014-0180 at p. 29, 168 So.3d at 546.

In this case, Naquin testified about the effect the accident and her injuries have had on her lifestyle. Naquin admitted that her injuries and pain have not stopped her from traveling and living her life "the best way [she] can." She admitted that she has taken trips to Honduras, Mexico, and Tennessee since the accident, but explained that "it doesn't mean I'm [not] in pain, it's just I can't crawl in a hole and die." She testified that no doctor has ever told her that she cannot drive long distances or go on vacations and that she stops to take a break every few hours while traveling and takes pain medicine and uses a heating pad in the car in order to deal with the pain. She further testified that she is limited in some activities because of the pain she experiences since her fall at CCA. For instance, she cannot participate in sports with her grandchildren and cannot go offshore fishing. However, she testified that she still attends family gatherings,

34

parties, and sporting events, where she either keeps score or watches her grandchildren from the sidelines, and she can still go for boat rides and fish.

An award of damages is subject to the abuse of discretion standard of review. *Wainwright v. Fontenot*, 2000-0492, p. 6 (La. 10/17/00), 774 So.2d 70, 74. In deciding not to make a separate award of damages for Naquin's loss of enjoyment of life, it is clear that the jury concluded that she did not experience a detrimental change in her lifestyle after the accident that would otherwise go uncompensated by the other general damage awards. Considering Naquin's testimony, we cannot say that the jury abused its discretion in so concluding. Accordingly, Naquin's answer to the appeal is denied.

Turning to CCA's argument that the jury's award of damages for Naquin's future physical and mental pain and suffering should be stricken or reduced because the jury found that she did not suffer a loss of enjoyment of life, we again note that damages for loss of enjoyment of life are only appropriate where the loss has not been adequately compensated by other general damage awards. The fact that the jury did not believe that a separate award was necessary in order to compensate Naquin for detrimental changes to her lifestyle does not mean that they could not have concluded that she would experience future physical and mental pain and suffering. The jury could have reasonably concluded based on the evidence that the injuries proven to have been sustained by Naquin did not cause her a detrimental lifestyle change warranting such an award. See *Kelley*, 2014-0180 at p. 29-30, 168 So.3d 528, 546-47.

CCA next argues that the future physical and mental pain and suffering award should be stricken or reduced because Naquin was fully compensated for past and future medical expenses, as well as past physical and mental pain and suffering. CCA seems to assert that the award is unsupported by the evidence and excessive because Naquin's symptoms were similar before and after the accident.

35

However, it is clear from the jury's verdict, especially their decision to award the cost of future medical expenses, including the spinal cord stimulator implant, that the jury found that Naquin continues to experience pain and suffering caused by the accident. This conclusion is supported by her testimony and the testimony of her treating physicians. Based on our review of the record, we cannot say that the jury abused its discretion in awarding damages for Naquin's future physical and mental pain and suffering. This assignment of error lacks merit.

## CONCLUSION

For the reasons set forth herein, the June 16, 2023 judgment of the trial court is affirmed and the answer to the appeal is denied. Costs of this appeal are assessed to defendants-appellants, Covenant Christian Academy of Houma, Louisiana and Church Mutual Insurance Company.

**AFFIRMED; ANSWER TO APPEAL DENIED.**